KLOPPENBERG AND COMPANY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kloppenberg & Co. v. Commissioner
Docket Nos. 14926-83, 14927-83, 14928-83, 14929-83, 14930-83, 14931-83, 14932-83, 14933-83, 14934-83.
United States Tax Court
T.C. Memo 1986-325; 1986 Tax Ct. Memo LEXIS 284; 51 T.C.M. (CCH) 1607; T.C.M. (RIA) 86325; July 29, 1986. *284 Held: Respondent's motions to amend the pleadings denied; individual petitioners received constructive dividends as a result of sale of property interest between related corporations; disallowance of portion of corporate petitioner's interest deduction sustained; individual petitioners did not realized ordinary income on sale of depreciable asset between related corporations; and assessment of deficiencies was not barred by statute of limitations. Melvin A. Coffee and Theodore H. Merriam, for the petitioners. Mark H. Howard and Christopher L. Neal, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioner Kloppenberg and Company's Federal income taxes for the years ending January 31, 1979 and January 31, 1980 of $10,883 and $13,053, respectively. Respondent also determined deficiencies in the individual petitioners' Federal income taxes as follows: Petitioner(s)
1978
1979
George A. and
$23,654
$3,188
Zona B. Kloppenberg
George F. and
$ 6,222
$ 337
Helen S. Kloppenberg
Joseph R. and
$ 9,544
$ 810
Mary C. Kloppenberg
James T. and
$ 4,828
$ 808
Mary C. Kloppenberg
Laura A. Kloppenberg [2]
$ 286
$ 16
Christine A. Kloppenberg [2]
$ 286
$ 16
Brian A. Kloppenberg [2]
$ 286
$ 16
Paul A. Kloppenberg [2]
$ 286
$ 16
*285 Explanation of Issues
The issues in this case arise out of a multi-step transaction involving two corporations (Kloppenberg and Company (Kloppenberg Co.) and G.A.Z.B. Corporation (GAZB)) and the G.A.Z.B. Trust (Trust), all of which were owned by some or all of the individual petitioners prior to May 3, 1978, and Tejon General Partnership (TGP), an unrelated entity. As structured by the Kloppenbergs and the principals of TGP, the May 3, 1978 transaction occurred as follows: (1) the shareholders of GAZB transferred all of their stock in GAZB to the Trust; (2) the Trust sold all of the GAZB stock to TGP; (3) GAZB was immediately liquidated and its assets, which were principally three parcels of real estate, viz the Oxford, the Elati, and the Tejon properties, were distributed to TGP; (4) TGP sold its interest in the Oxford property to Kloppenberg Co. for $1 million. [3] Kloppenberg Co. had been the sole tenant of the Oxford property *286 for some years. Respondent determined that, in contrast to its form, the substance of the portion of the transaction relating to the Oxford property was a sale of an interest in that property at a price in excess of fair market value by GAZB to Kloppenberg Co. with a subsequent distribution of sale proceeds to the shareholders of GAZB. According to respondent, TGP's role was that of a conduit or "straw man" for the multi-step transaction as far as the interest in the Oxford property is concerned. Based on respondent's pre-trial position, the issues for decision are: [4]
(1) Whether Kloppenberg Co. purchased an interest in the Oxford property at a price in excess of its fair market value; (2) if (1), whether the individual petitioners received constructive dividends from Kloppenberg Co. as a result of the purchase of the Oxford property interest; (3) if (2), whether the interest deductions flowing from the May 3, 1978, transaction *287 claimed by Kloppenberg Co. must be decreased as a consequence of the constructive dividends; (4) whether the individual petitioners received ordinary income pursuant to section 1239 [5] on the transfer of GAZB's interest in the Oxford property, a depreciable asset, to Kloppenberg Co.; and (5) whether assessment of deficiencies as to Kloppenberg Co. for the years ending January 31, 1979, and the individual petitioners for 1978 is barred by the running of the applicable statute of limitations. On brief, respondent requests that the Court allow him to amend the pleadings in a number of respects which requests will be addressed in the opinion portion of this report. The most significant of these requested amendments *288 is consideration of a different "form" of the challenged transaction, i.e., a distribution of the interest in the Oxford property by GAZB or the Trust to the shareholders/beneficiaries followed by a sale of the Oxford property to Kloppenberg Co. Based on this reformulation, respondent asserts that the individual petitioners also received constructive dividends from GAZB. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits are incorporated herein by this reference. Kloppenberg Co.'s principal place of business at the time its petition was filed was Englewood, Colorado. The individual petitioners were all residents of Colorado at the time their respective petitions were filed. The Kloppenberg Family Corporations
Kloppenberg Co. manufactures ice machines and is a custom fabricator of stainless steel food service equipment. During the years in issue Kloppenberg Co.'s plant and offices were located in a building specifically built for the company on the Oxford property. In April 1978, the stock of Kloppenberg Co. was owned by petitioners George A. and Zona B. Kloppenberg and their sons (referred to collectively as the Kloppenberg *289 Family) as follows: Ownership
Petitioner
Percentage
George A. Kloppenberg
35
Zona B. Kloppenberg
35
George F. Kloppenberg
10
Joseph R. Kloppenberg
10
James T. Kloppenberg
10
In addition to their status as shareholders, with the exception of Joseph R. Kloppenberg who was a consultant to the Board of Directors, each member of the Kloppenberg Family was a director and officer of Kloppenberg Co. in April 1978. Kloppenberg Co.'s retained earnings and profits on May 3, 1978, the date of the challenged transaction, were in excess of $473,000. In 1978 GAZB's only business was holding the Oxford property and properties located on Elati Street (the Elati property) and Tejon Street (the Tejon property) and collecting rents thereon. The retained earnings of GAZB shown on the final return filed for the period ended May 3, 1979, were $173,119. On April 25, 1978, George F. Kloppenberg transferred six shares of his GAZB stock to each of his four minor children under the Colorado Uniform Gifts to Minors Act. [6] As of that date, the shares of the GAZB stock were held as follows: Number of
Petitioner
Shares
George A. Kloppenberg
95
Zona B. Kloppenberg
95
George F. Kloppenberg
36
Joseph R. Kloppenberg
60
James T. Kloppenberg
60
Christine A. Kloppenberg
6
Paul A. Kloppenberg
6
Brian A. Kloppenberg
6
Laura A. Kloppenberg
6
*290 With the exception of the children, each shareholder was a director and officer of GAZB. The Oxford Property
In 1966, GAZB acquired the land on West Oxford Street at a cost of $50,111. On September 8, 1966, a net ground lease was executed between GAZB and Kloppenberg Co. The lease term was 30 years and the rent was $12,000 per year payable on a monthly basis. Pursuant to the terms of the lease, Kloppenberg Co. was required to erect a building on the Oxford property in accordance with a previously approved plan [7] *291 at a cost of not less than $430,000. At the expiration of the lease, the building would be surrendered to GAZB. The lease specifically provided that "the covenants, stipulations, and conditions herein contained shall inure to the benefit of and shall be binding upon the successors and assigns of the lessor and the successors and assigns of the lessee." On November 10, 1966, Kloppenberg Co. entered into construction and permanent financing agreements with the Engelwood State Bank concerning construction of the building on the Oxford property. The loan was in the amount of $310,000 and was for a term of 15 years. As security for this loan, Kloppenberg Co. delivered to the Bank a promissory note which was secured by a deed of trust on the Oxford property executed by GAZB and Kloppenberg Co. To provide additional security for payment of the note, GAZB assigned to the Bank its lease agreement with Kloppenberg *292 Co. In fact, the lease agreement had originally been executed because the Bank required a written lease before it would provide the construction financing.The Bank loan was paid in full on January 31, 1972 and shortly thereafter the Bank released all collateral on the loan. During the years in issue, Kloppenberg Co. claimed depreciation for the building on its Federal corporate income tax returns. As noted above, the rent specified in the lease was $1,000 per month. However, at a special meeting of the Board of Directors of Kloppenberg Co. on April 17, 1974, George A. Kloppenberg, the president of both GAZB and Kloppenberg Co., recommended increasing the rent to $1,500 per month, retroactive to April 1, 1974. A motion to this effect was unanimously approved and, thereafter, Kloppenberg Co. paid this increased rent. The lease agreement was not amended to reflect this increased rent. Four appraisals of the Oxford property were received in evidence. Each appraisal valued the property as of May 3, 1978. The first appraisal is a September 23, 1980 Engineer Memorandum Report prepared by Eddie T. Fernandez, an engineer in respondent's employ. Based on an assumed fee simple fair market *293 value of $442,000, Mr. Fernandez concluded that the fair market value of the Oxford property subject to the leasehold interest held by Kloppenberg Co. was $300,000. The second appraisal, obtained by petitioner Kloppenberg Co., is dated November 29, 1980, and was prepared by Watson A. Bowes. This appraisal was based on the assumption that the property was "free and clear" of all encumbrances, i.e., Mr. Bowes did not consider the outstanding leasehold interest of Kloppenberg Co. Using three methods of appraisal, Mr. Bowes concluded that the value of Oxford property was $1,940,000. Apparently in response to petitioners' appraisal, Mr. Fernandez prepared a supplemental Engineer Memorandum Report dated February 12, 1981. The same method of valuation [8] and rental of $18,000 per year as in the original report were used. However, Mr. Fernandez used a lower discount rate of 9.25 percent. Based on the unencumbered fee interest value determined by petitioners' appraiser of $1,940,000, with which he agreed, Mr. Fernandez reached a revised value for the fee interest subject to the outstanding leasehold interest of $527,000. Of this value, $273,000 was allocable to the land and $254,000 to *294 the building. The fair market values found by Mr. Fernandez in this appraisal were adopted by respondent in the notices of deficiencies. In preparing for trial, respondent obtained a third appraisal of the Oxford property by Peter D. Bowes and Brooke B. Leer (Trial Appraisal). Based on sales of comparable properties, the Trial Appraisal concluded that the fair market value of the unencumbered fee interest in the Oxford property was $1,700,000 and the fair market value of the interest subject to the lease was $650,000 or in a range of value of $526,426 to $710,068. The range of values was computed using discount rates of 6.5 percent and 8.5 percent. The Trial Appraisal was based on rent of $1,500 per month. Pre-Transaction Discussions Concerning GAZB
During 1976 and 1977, the shareholders/directors of GAZB engaged in numerous discussions concerning the possibility of a liquidation or dissolution of GAZB. In considering *295 these options, the Kloppenberg Family always intended that the Oxford property would be transferred to Kloppenberg Co. As early as June 26, 1976, the shareholders/directors of GAZB had "approved the principle of liquidation" and were giving this possibility serious consideration. On December 17, 1977, a plan to liquidate GAZB was approved at a special directors' meeting. This plan was to become effective only upon the vote of at least two-thirds of the outstanding shares of the corporation at a special shareholders' meeting scheduled for February 1, 1978. The plan of liquidation adopted by the Board of Directors was never voted on or adopted by the shareholders. However, in contemplation of adoption of the plan, Forms 964 (Election of Shareholder under Section 333 Liquidation) were signed by each shareholder and Form 966 (Corporate Dissolution or Liquidation) was signed by George A. Kloppenberg on behalf of GAZB. These forms were retained in the files of GAZB's accountant but, since no liquidation occurred, were never filed with the Internal Revenue Service. [9] Prior to the challenged May 3, 1978, transaction, no GAZB liquidation occurred nor were any assets of GAZB distributed *296 to the individual petitioners. Negotiations Preceding the May 3, 1978 Transaction
In October 1977, GAZB was approached by Terrance L. Schmidt with an offer to purchase the Tejon property. At that time, Schmidt and Jonathan E. Sharp were negotiating to purchase the Rose Manufacturing Company (Rose) and needed a building in which to relocate that business. Schmidt's offer of $475,000 for the Tejon property was refused. As Schmidt was unable to negotiate a quick purchase of the Tejon property, Rose entered a lease for this property effective December 1, 1977. The lease term was 7 years with an option in Rose to extend the term for 3 years. Rose also obtained a right of first refusal if GAZB elected to sell the Tejon property and received a third party offer. This right of first refusal did not apply if GAZB elected to dissolve *297 and assign its interest to its shareholders. [10] After the lease was executed, Schmidt continued to negotiate with the directors of GAZB for the purchase of the Tejon property. A major difficulty in these negotiations involved the tax liability that would be incurred by GAZB and its shareholders as a result of such a sale. An impasse in negotiations was reached in March 1978. The May 3, 1978 Transaction
As a final proposal, Schmidt suggested that Tejon General Partnership (TGP) [11], a partnership the shareholders of Rose controlled, acquire the stock of GAZB, immediately thereafter liquidate the corporation and sell the Oxford property to Kloppenberg *298 Co. In considering this proposal, neither party contemplated that the partnership would retain the Oxford property. In fact, transfer of the Oxford property interest to Kloppenberg Co. was understood as a condition of any sale of the GAZB stock to TGP. Schmidt's proposal met the primary objectives of both parties -- the principals of Rose would acquire the Tejon property and the Kloppenberg Family would retain ownership of the Oxford property without incurring certain taxes. The transaction, as proposed by Schmidt, was consummated on May 3, 1978. [12] On May 3, 1978, all of the stock of GAZB was transferred to a newly formed G.A.Z.B. Trust (Trust). George A. Kloppenberg was designated the managing trustee of said Trust. Each GAZB shareholder received a beneficial interest in the Trust corresponding to his/her prior ownership *299 of GAZB stock. Before acquiring GAZB's stock on May 3, 1978, TGP entered an option contract to sell the Oxford property interest it would acquire to Kloppenberg Co. The option contract states that: "WHEREAS, Tejon intends to purchase G.A.Z.B. Corporation; and WHEREAS, Kloppenberg desires to purchase and Tejon desires to sell the herein described real estate," if TGP acquired GAZB's stock it would liquidate the corporation and sell the Oxford property, subject to the existing lease, to Kloppenberg Co. for $1 million. [13] To effectuate the sale to TGP, an "Agreement to Purchase Stock" was executed by TGP and the Trust. TGP paid $1,603,600 for all of GAZB's stock. The majority of the purchase price was allocated to the three properties owned by GAZB as follows: [14] *300 Oxford Property
$1,000,000
Tejon Property
500,000
Elati Property
50,000
Correspondence from TGP's to GAZB's attorney dated April 12, 1978, indicates that the parties had agreed that the $500,000 allocated to the Tejon property and the $50,000 allocated to the Elati property reflected the fair market values of those properties. However, as of that date, the purchase price for the interest in the Oxford property had not been determined. The $1 million subsequently agreed to for this interest was calculated by the accountant for the Kloppenberg family and their controlled corporations. Despite the fact that in the "Agreement to Purchase Stock" the Trust warranted that GAZB owned the Oxford property "in fee simple * * * subject to the existing leases," this calculation was based on an unencumbered fee interest in the Oxford property, i.e., the impact on value of the lease between GAZB and Kloppenberg Co. was not considered. Nor was any special use value the Oxford property may have to Kloppenberg Co. considered.In agreeing to the $1,000,000 value, TGP's principal concern was that its security interest in the property be adequate in relation to the Installment Note from Kloppenberg *301 Co. to TGP. On May 3, 1978, TGP paid the Trust $185,000 in cash and executed four Installment Notes, three of which were secured by Deeds of Trust on specific properties as follows: [15] *302 Note
Principal Amount
Securing Asset
$900,000
Oxford Property
450,000
Tejon Property
45,000
Elati Property
The notes from TGP to the Trust were secured by GAZB's underlying assets rather than the stock as the corporation was to be immediately liquidated. The $900,000 Installment Note secured by the Oxford property was payable as follows: (1) $100,000 plus $6,562.50 interest payable on June 3, 1978; (2) $100,000 plus $5,833.33 interest payable July 3, 1978; and (3) $700,000 principal, plus interest, payable in 238 equal monthly installments. The Note specifically provided that there would be no prepayment before February 1, 1979. To effectuate the liquidation of GAZB the following steps were taken: (1) the Kloppenberg Family directors of GAZB resigned; (2) Schmidt, Jonathan E. Sharp and Jon C. Sharp were elected directors of GAZB; and (3) a plan of complete liquidation and distribution of all property was adopted at a special joint meeting of the new shareholders and directors of GAZB. The minutes of this May 3, 1978 meeting state: [the President, Jonathan E. Sharp] reported that certain lessees had inquired about the possibility of purchasing their leased premises, that the Corporation had refrained from any negotiations to that end, and that there were no outstanding commitments to sell binding on the Corporation. The President further advised that the new, sole shareholder [TGP] had entered *303 into negotiations with the lessees prior to becoming a shareholder and had entered into several agreements relating to the purchase of the land, which agreements were to be effective if any only if the current shareholder did, in fact, acquire control of this Corporation. Upon liquidation of GAZB, appropriate Deeds of Turst were executed by Jonathan E. Sharp on behalf of GAZB to convey the property owned by the corporation to TGP. To transfer TGP's interest in the Oxford property to Kloppenberg Co. an "Agreement to Purchase Real Estate" was also executed on May 3, 1978. The purchase price was $1,000,000, identical to that portion of TGP's purchase price for the GAZB stock allocated to the Oxford property. The terms of payment were $100,000 cash and execution of a $900,000 Installment Note. With the exception of the maker and payee, the terms of this Note were identical to the $900,000 Note between TGP and the Trust. The "Agreement to Purchase Real Estate" required that TGP provide evidence of a reduction in the outstanding first mortgage on the Oxford property within 10 days of any principal payment by Koppenberg Co.
Kloppenberg Co. received from TGP a Deed for the Oxford property *304 which was "subject to [the] first Deed of Trust securing G.A.Z.B. Trust, and subject to [the] existing lease to Kloppenberg and Company." In contrast, the Deed of Trust given by Kloppenberg Co. to TGP to secure its $900,000 Note was for the unencumbered fee simple interest [16] in the Oxford property "except [for] the First Deed of Trust given by Tejon General Partnership to G.A.Z.B. Trust." Of the $1,603,600 purchase price for the GAZB stock paid by TGP, $1,562,256 or 97.42 percent represents gain. As principal payments of $419,710 were received in 1978, the Trust return for that year reports $408,881 of that amount as capital gain. In 1979, the Trust return reflects receipt of $23,693 of what are characterized as capital gains. In both years, these amounts, as well as the interest payments made by TGP, were, after deduction of expenses, distributed in full to the trust beneficiaries. In the notices of deficiencies, respondent determined that *305 the fair market value of the Oxford property interest purchased by Kloppenberg Co. on May 3, 1978, was $527,000 and that the $473,000 excess purchase price constituted constructive dividends to the individual petitioners from Kloppenberg Co. Consequently, respondent increased their ordinary income and decreased their reported capital gains. As a consequence of this recharacterization, respondent disallowed a portion of the interest deduction claimed by Kloppenberg Co. asserting that a deduction for interest on the constructive dividends was not allowable. Respondent also determined that, in substance, members of the Kloppenberg Family had sold a depreciable asset to Kloppenberg Co. and, therefore, the individual petitioners must recognize ordinary income pursuant to section 1239. Statute of Limitations Issue
Kloppenberg Co. and each of the individual petitioners timely filed their Federal income tax returns for the years in issue. Forms 872-A (Special Consent[s] to Extend the Time to Assess Tax) were timely executed by or on behalf of Kloppenberg Co. for its tax year ending January 31, 1979, and each individual petitioner for 1978. Each of these provided that the agreed to extension *306 could be terminated by receipt of a Form 872-T (Notice of Termination of Special Consent to Extenid the Time to Assess Tax) from the taxpayer or mailing of such Form 872-T or a notice of deficiency by the Internal Revenue Service. By letter dated July 21, 1982, to respondent, petitioners' counsel sought to verify his understanding of a July 20 telephone conversation concerning Kloppenberg Co. and related taxpayers in which he stated: It is my understanding that you will forward the case for issuance of a 90-day letter based on a partial agreement.You have agreed to concede the accumulated earnings tax issue and there has been no resolution to the real estate issue. We understand that the taxpayers will be receiving statutory notices of deficiencies within the next 60 days. Notices of deficiencies were mailed to petitioners on March 15, 1983. [17] No Form 872-T was mailed or received by respondent prior to mailing by respondent of these notices of deficiencies. OPINION Respondent's Motions to Amend
As a preliminary matter, we must dispose of *307 respondent's requests that he be allowed to amend the pleadings in four respects.[18] *308 These requests were made for the first time in respondent's brief. Generally, issues raised at such a late date are not considered properly before the Court. Church of Scientology v. Commissioner,83 T.C. 381, 524-525 (1984); Aero Rental v. Commissioner,64 T.C. 331, 338 (1975); Markwardt v. Commissioner,64 T.C. 989, 997 (1975). However, Rule 41(a) provides that the Court, in its discretion, may grant motions to amend at any time if "justice so requires," i.e., if granting said motions will not result in surprise and substantial detriment/prejudice, to petitioners. Johnsen v. Commissioner,83 T.C. 103 (1984); Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973). The first amendment respondent requests is that the constructive dividend income allocated to the children of George F. Kloppenberg in the notices of deficiencies be reallocated to the remaining individual petitioners. This request is premised on respondent's late realization that these minors were not shareholders of Kloppenberg Co. and "[t]o be technically correct, the distributions from Kloppenberg and Company should be treated as dividends only to the stockholders of Kloppenberg and Company." [19] *309 Consideration of this issue would clearly prejudice the individual petitioners whose income respondent seeks to increase. Therefore, we deny respondent's request to amend the pleadings to consider this issue. [20]
As a second amendment, respondent requests that the Court find that there was a constructive dividend of $173,119 from GAZB to the individual petitioners through the Trust. Respondent's counsel misstates the record in arguing that during trial he specifically requested an opportunity to amend the pleadings in this regard.During trial respondent's counsel stated that, if after an examination of the documents and facts it is established the transaction should be recast in a "slightly different manner," *310 he requested "that the pleadings be allowed to be amended to conform to that proof to that extent dealing solely with this dividend issue from Kloppenberg and Company raised by the statutory notice." [21] No mention was made of dividends from GAZB. In fact, prior to receipt of respondent's brief, neither the Court nor petitioners had any indication that respondent would seek to recharacterize a portion of the proceeds attributable to the Oxford property as constructive dividends from GAZB. To require petitioners to respond to this allegation would result in substantial prejudice to them.Therefore, respondent's request to amend the pleadings to assert that petitioners received constructive dividends from GAZB is denied. Respondent also requests that two amendments be made to the pleadings regarding the application of section 1239: (1) that the value placed on the depreciable remainder interest be increased; and (2) that petitioners' use of the installment method of reporting gain in the section 1239 context *311 be disallowed. As to the value attributed to the depreciable remainder interest, consideration of an increased value will not result in surprise or unfair prejudice to petitioners. Although we have considered this contention, respondent has failed to carry his burden of proving that the value of depreciable remainder interest in the Oxford property is greater than that set forth in the notices of deficiencies. Respondent's request to place in issue petitioners' use of the installment method must be denied. Disallowance of installment gain reporting would clearly be prejudicial to petitioners as they were not afforded an opportunity to present evidence or arguments on this issue. Consequently, we deny respondent's motion to amend the pleadings to raise this issue. [22] *312 Valuation of the Oxford Property Interest
Having disposed of respondent's requests to amend the pleadings, we now turn to the parties' substantive disputes. [23] *313 Initially, we must determine the value of the Oxford property interest acquired by Kloppenberg Co. on May 3, 1978. A determination that Kloppenberg Co. paid no more than the fair market value for this interest would effectively dispose of respondent's determinations that the individual petitioners received constructive dividends from Kloppenberg Co. and that a portion of Kloppenberg Co. 's interest deduction should be disallowed. Petitioners assert that the fair market value of the interest in the Oxford property in issue on May 3, 1978, was $1 million. In contrast, respondent determined in the notices of deficiencies that the fair market value of this interest was $527,000. The determination of fair market value is a question of fact. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright,411 U.S. 546, 551 (1973). Petitioners have the burden of proving that respondent's determination of fair market value is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). They have failed to carry this burden. In challenging respondent's valuation, petitioners assert that the $1 million value allocated to the Oxford property interest in the transfers *314 between the Trust and TGP and Kloppenberg Co. and TGP represents the product of arm's-length negotiations and, therefore, is the most probative evidence of fair market value. While "a normal attribute of a true arm's-length sale is a purchase price at least approximately equal to fair market value," Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1240-1241 (1981), the mere fact that a $1 million purchase price was agreed to between unrelated parties does not, in and of itself, indicate that said price is the result of arm's length negotiations.While negotiations leading up to the challenged transaction occurred over a period of approximately 4 months, the valuation of the Oxford property was not a focus of these negotiations. In fact, it appears that neither Schmidt nor TGP were particularly concerned with the value attributed to the Oxford property so long as TGP obtained adequate security from Kloppenberg Co. for its $900,000 note. The security TGP obtained for this note was a deed of trust encompassing a fee simple interest in the Oxford property. The parties are in accord that said interest had a fair market value well in excess of $1 million. Consequently, TGP assumed *315 no risk that Kloppenberg Co. would fail to make payments on its note and had little incentive to negotiate with respect to the value allocated to a lesser interest in the Oxford property. Similarly, the Kloppenberg Co. shareholders assumed no risk that TGP would benefit from an excessive price as TGP was required to make corresponding payments to the Trust any time it received principal payments from Kloppenberg Co. Neither the portion of the stock purchase price allocated to the Oxford property interest nor the agreed to purchase price paid by Kloppenberg Co. was the result of arm's-length negotiations. See Goldstein v. Commissioner,T.C. Memo. 1960-276, affd. 298 F.2d 562 (9th Cir. 1962). Consequently, we must independently seek to determine the fair market value of the Oxford property interest in issue. Petitioners submitted one appraisal of the Oxford property. This appraisal is of no value to the Court as it values the fee simple interest in the Oxford property rather than the interest Kloppenberg Co. acquired on May 3, 1978. Petitioners' argument that the lease between GAZB and Kloppenberg Co. should be disregarded in valuing the Oxford property interest is meritless. No *316 one disputes that after May 3, 1978, Kloppenberg Co. owned the Oxford property in fee simple. However, petitioners' argument that the lease should therefore be disregarded ignores the fact that Kloppenberg Co. owned a significant interest in the Oxford property prior to the challenged transaction.It is not the value of the combined interest which Kloppenberg Co. owned after May 3, 1978, which is in issue. Rather, it is the interest which Kloppenberg Co. purchased from TGP on that date, i.e., a fee simple interest subject to the outstanding lease. Similarly, petitioners' arguments that the written lease was entered solely at the Bank's insistence and that after the Bank loan was paid off the Kloppenberg Family believed the lease had no effect are irrelevant. While the Bank loan may have been the precipitating factor in executing a written lease between Kloppenberg Co. and GAZB, the loan and the lease were not interdependent. Petitioners' assertion that after the Bank loan was paid off the lease had no effect is contrary to fact. Kloppenberg Co. continued to claim depreciation deductions for the Oxford building thereby recognizing its continuing interest in the Oxford property. *317 Similarly, in the May 3, 1978, transaction documents, descriptions of the Oxford property explicitly referenced the leasehold interest held by Kloppenberg Co. Respondent's determination that the fair market value of the relevant Oxford property interest was $527,000 is presumed correct and is supported by the February 12, 1981, appraisal of Mr. Fernandez and the Trial Appraisal. Petitioners seek to discredit these appraisals arguing that they are based on the faulty assumption that the buyer of the Oxford property interest from TGP would be bound by the lease. This assumption is not false. Since the purchaser of the property was Kloppenberg Co., the existing lessee, there was a merger of the leasehold and the fee subject to the lease, effectively cancelling the lease. This is a result of the two interests being held by the same person. It does not mean that the leasehold estate should be ignored in the valuation. The standard for determining fair market value is not an exceptional purchaser with a pre-existing interest in the property to be valued. The lease explicitly provided that its terms were binding on any successor or assigns of GAZB. Any purchaser of the interest in the *318 Oxford property from TGP was bound by the terms of the lease. [24] Petitioners also argue that respondent's appraisals fail to reflect the special features of the Oxford property which were of particular use to Kloppenberg Co.The fact that Kloppenberg Co. may have found certain features of the Oxford building of particular use would not increase the fair market value of the property. [25] Although a buyer might be willing to pay a premium for property which had a special significance or value to that person, that special value would not increase the fair market value. Fair market value is the price which an hypothetical willing buyer will pay an hypothetical willing seller. To acquie the property, it would be necessary only to match *319 the "best" price, i.e., fair market value. Also this record does not support a market value higher than respondent has determined. Petitioners' advance two additional challenges to respondent's appraisals: that the 9.25-percent discount rate used by Mr. Fernandez in his February 12, 1981, appraisal is too high and that the Trial Appraisal made no allowance for appreciation.While articulating these challenges, petitioners provided no facts in support thereof. Based on our review of the record we sustain respondent's notices of deficiencies' determinations that the fair market value of the Oxford property interest in issue, on May 3, 1978, was $527,000 and that, of this amount, $254,000 was allocable to the Oxford building. The Constructive Dividends Issue
Having determined that Kloppenberg Co. paid $473,000 more than the fair market value for the interest in the Oxford property it acquired on May 3, 1978, we must now decide whether that excess *320 constitutes constructive dividends to the Kloppenberg family.For tax purposes, a dividend is any distribution of property made by a corporation to its shareholders out of accumulated or current earnings and profits (after February 28, 1913). Sections 316(a), 301(a)(c); section 1.301-1(j)(1), Income Tax Regs. No formal dividend declaration need be made nor must the distribution be made directly by the corporation. Sparks Nugget, Inc. v. Commissioner,458 F.2d 631 (9th Cir. 1972), affg. a Memorandum Opinion of this Court. Further, it is well established that a transfer of property between two corporations may constitute a dividend to an individual who has an ownership interest in both corporations. Sammons v. Commissioner,472 F.2d 449, 451 (5th Cir. 1972); Green v. United States,460 F.2d 412 (5th Cir. 1972); Commissioner v. Makransky,321 F.2d 598, 601-602 (3d Cir. 1963), affg. 36 T.C. 446 (1961). In deciding the instant case we are mindful that the "expensive principles governing the treatment of constructive dividends reflect an awareness by Congress and the courts of the ingenious methods which have been devised by owners of closely held corporations trying to escape taxes *321 at the corporate or shareholder level." Baumer v. United States,580 F.2d 860, 877 (5th Cir. 1978). Respondent determined that the transfer of the Oxford property to TGP and subsequent sale to Kloppenberg Co. should be severed from the sale of GAZB stock to TGP and the tax consequences of the Oxford property "transaction" analyzed independently. [26] *322 From respondent's perspective, the crucial facts are: (1) that the Kloppenberg family never parted with control over the interest in the Oxford property owned by GAZB; (2) that Kloppenberg Co. purchased GAZB's interest in the Oxford property at a price in excess of its fair market value; and (3) that the shareholders of Kloppenberg Co. received the benefit of this excessive price. Consequently, respondent determined that the excessive purchase price paid by Kloppenberg Co. constituted constructive dividends.Petitioners bear the burden of proving this determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
Our resolution of the constructive dividends issue is, in the final analysis, a question of whether the substance of the May 3, 1978, transaction as to the Oxford property comports with its form. As stated in Crenshaw v. United States,450 F.2d 472, 475-476 (5th Cir. 1971): The tax policy of the United States is concerned with realities rather than appearances, and when an illusory facade is constructed solely for the purpose of avoiding a tax burden the astute taxpayer cannot thereafter claim that a court is bound to treat it as being a genuine business arrangement. * * * See also J. Strickland & Co. v. United States,352 F.2d 1016 (6th Cir. 1965); Lacy v. Commissioner,341 F.2d 54 (10th Cir. 1965), affg. 39 T.C. 1100 (1963), affg. Cuckler v. Commissioner,39 T.C. 1107 (1963), *323 and affg. Trinidad National Bank v. Commissioner,T.C. Memo. 1963-93; Martin v. Commissioner,44 T.C. 731 (1965), affd. in part 379 F.2d 282 (6th Cir. 1967). Citing Frank Lyon Co. v. United States,435 U.S. 561 (1978), petitioners assert that the May 3, 1978, transaction was "a genuine multi-party transaction" with economic substance. As to the Oxford property, this assertion is not supported by the facts. Prior to purchasing the GAZB stock, TGP contracted to sell the Oxford property to Kloppenberg Co. at a price established by GAZB and Kloppenberg Co. On the basis of the evidence of record, we conclude that respondent's characterization of TGP as a "straw man" or conduit is correct. TGP's insertion into the May 3, 1978, transaction created the appearance, but not the substance, of a three-party transaction as to the Oxford property. This Court is not obliged to recognize the structure of a purported transaction, including the ostensible participants, when the form imposed diverges from the substance. Minnesota Tea Co. v. Helvering,302 U.S. 609, 613 (1938). In determining the existence of a dividend, the courts have looked to the economic effect of the transactions -- the intent *324 of the parties is not dispositive. See Baumer v. United States,supra at 876; Magnon v. Commissioner,73 T.C. 980, 993-994 (1980); Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In the instant case, the excessive price paid for the Oxford property interest by Kloppenberg Co., after passing through TGP and the Trust without diminution, was paid to members of the Kloppenberg family. The economic substance of this aspect of the challenged transaction was a dividend to said shareholders. In arguing that the form of the challenged transaction should be observed, petitioner asserts that respondent has failed to show that the underlying documents which comprise the transaction were "shams, illusory, meaningless, or the like." The basic premise of this assertion is incorrect -- petitioners have the burden of proving the substance of the transaction comports with its form. Neither respondent nor this Court is required to give credence to underlying documents of a purported transaction merely because such documents have been formally executed. Frank Lyon Co. v. United States,supra at 573; United States v. Cumberland Public Service Co.,338 U.S. 451 n.3 (1950); *325 Crenshaw v. United States,supra at 475-476; Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1164 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The fact that deeds were executed conveying the Oxford property interest from GAZB to TGP and from TGP to Kloppenberg Co. is not controlling. As stated by Supreme Court in Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945): The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Fn. ref. omitted.] Petitioners admit that the challenged transaction was structured to "avoid unnecessary tax liability to GAZB and its shareholders." *326 They argue, however, that the transaction had a valid business purpose, i.e., to sell the Tejon property but not the Oxford property to TGP, and that this purpose motivated and permeated the entire transaction. Citing United States v. Cumberland Public Service Co.,supra and Bolker v. Commissioner,81 T.C. 782 (1983), affd. 760 F.2d 1039 (9th Cir. 1985), petitioners further argue that, as a policy matter, it is immaterial that the specific form of the transaction was dictated by tax considerations. What petitioners chose to ignore is the fact that, where transactions serve no "purpose, substance, or utility apart from their anticipated tax consequences," they are disregarded for tax purposes. Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). See also Knetsch v. United States,364 U.S. 361 (1960); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 185 (1983), affd. in part 732 F.2d 89 (4th Cir. 1985). The only reason for the structure of the challenged transaction was to further the tax objectives of the shareholders of Kloppenberg Co. Requiring TGP to serve as a conduit for the transfer of GAZB's interest in the Oxford property to Kloppenberg *327 Co. does not imbue that transfer with a valid business purpose. Nor can petitioners cite any corporate business purpose served by the excessive purchase price ostensibly paid by Kloppenberg Co. for the Oxford interest. The significant inflation of said price served but one purpose -- to attempt to withdraw accumulated earnings from Kloppenberg Co. at capital gains rates. After careful consideration of each of petitioners' arguments, we conclude that respondent's characterization of the May 3, 1978, transaction as it relates to the Oxford property is correct. In substance, albeit not in form, GAZB sold said interest to Kloppenberg Co. Based on this conclusion, we sustain respondent's determination that the excess purchase price paid by Kloppenberg Co. constitutes constructive dividends to the Kloppenberg family petitioners. Kloppenberg Co.'s Interest Deduction Issue
In the notice of deficiency to Kloppenberg Co., respondent disallowed the portion of that corporation's interest deduction representing that portion of the payments on the note from Kloppenberg Co. to TGP attributable to the excess purchase price which we have found were constructive dividends. [27] Kloppenberg Co.'s sole *328 argument against this disallowance is that no constructive dividends were paid. [28] Having found to the contrary, we sustain respondent's interest deduction disallowance. Section 1239 Issue
We now consider respondent's determinations that a portion of the capital gains reported by the individual petitioners should be recharacterized as ordinary income pursuant to section 1239.In pertinent part, section 1239 provides: (a) Treatment of Gain as Ordinary Income. -- In the case of a sale or exchange of property, directly or indirectly, between related persons, *329 any gain recognized to the transferor shall be treated as ordinary income if such property is, in the hands of the transferee, of a character which is subject to the allowance for depreciation provided in section 167. (b) Related Persons. -- For purposes of subsection (a), the term "related persons" means -- * * * (2) an individual and a corporation 80 percent or more in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual, or (3) two or more corporations 80 percent or more in value of the outstanding stock of each of which is owned, directly or indirectly, by or for the same individual. Respondent's argument that the individual petitioners' ordinary income should be increased pursuant to section 1239 apparently is premised on his position that, prior to May 3, 1978, GAZB was liquidated and its assets distributed. The facts do not support this position. Although a plan of liquidation was adopted by the directors in June 1976, this plan was never voted on or adopted by the shareholders. We have found that, in substance, GAZB sold its interest in the Oxford property to Kloppenberg Co. Section 1.1239-1(c)(2) provides, in part: In general, *330 in the case of a sale or exchange of depreciable property between related corporations (within the meaning of paragraph (b)(3) of this section), gain which is treated as ordinary income by reason of this section shall be taxable to the transferor corporation rather than to a controlling shareholder. However, such gain shall be treated as ordinary income taxable to a controlling shareholder rather than the transferor corporation if the transferor corporation is used by a controlling shareholder as a mere conduit to make a sale to another controlled corporation, or the entity of the corporate transferor is otherwise properly disregarded for tax purposes.* * * Under this provision, a portion of GAZB's gain on its sale to Kloppenberg Co. would be treated as ordinary income. However, GAZB is not a petitioner in this proceeding. Nor has respondent argued that this corporate entity should be disregarded and its gain imputed to the individual petitioners. In fact, in the context of arguing the impact of the lease between GAZB and Kloppenberg Co. on the fair market value of the Oxford property interest, respondent argues that these corporate entities should not be disregarded. For tax purposes, *331 a corporation is not ordinarily regarded as the alter ego or agent of its shareholders. Deputy v. DuPont,308 U.S. 488 (1940); Burnet v. Clark,287 U.S. 410 (1932); Arata v. Commissioner,277 F.2d 576, 578 (2d Cir. 1960). We see no reason to disregard GAZB's status as a separate and distinct entity. As the individual petitioners did not sell an Oxford property interest, section 1239 is inapplicable to them. Consequently, we hold against respondent on this issue. Statute of Limitations Issue
The final issue for decision is petitioners' condtention that assessment of deficiencies for the earlier year in issue is barred. Section 6501(a) provides the general rule that income tax shall be assessed within 3 years after the return is filed. However, section 6501(c)(4) provides that the period of limitations will not expire if the taxpayer and the Commissioner timely agree in writing to extend the time for assessment. The Commissioner has provided Form 872-A for this purpose. The parties are in agreement that valid Forms 872-A were executed on behalf of Kloppenberg Co. for its taxable year ending January 31, 1979, and for each of the individual petitioners for the 1978 year. [29] Petitioners *332 argue, however, that the extensions provided by these Forms were effectively revoked by the letter from petitioners' counsel to respondent dated July 21, 1982. Subsequent to briefing by the parties, this Court has specifically addressed the question of how termination of a Form 872-A extension may be effectively achieved. In Grunwald v. Commissioner,86 T.C. 85 (1986), the Court determined that: The relevant waiver * * * which petitioner signed and which respondent accepted expressly and explicitly sets out the 3 methods by which the period of limitations could be terminated * * *. The very purpose expected to be served by Form 872-T would be frustrated *333 were the parties free to indulge themselves in whatever form of termination might strike their fancy, regardless of the degree of informality chosen. * * * * * * * * * A deal is after all a deal, and fairness dictates that both parties adhere to the provisions of the document they both voluntarily signed. * * * [86 T.C. at 89.] In Grunwald the Court held that a letter sent by respondent's appeal officer did not effectuate a termination of a Form 872-A extension. Similarly, in Jordan v. Commissioner,T.C. Memo. 1986-124, the Court held that a letter from petitioner's counsel to a special agent of respondent "does not conform to the terms of the consent signed by petitioners, [and] it cannot constitute termination of the consents." Based on these controlling precedents, we hold that petitioners' counsel's letter did not effectuate any termination of the Form 872-A extensions. Since the extensions were in effect when the notices of deficiencies were issued, assessment of said deficiencies is not barred by the running of any statute of limitations. Decisions will be entered for petitioners in docket Nos. 14931-83, 14932-83, 14933-83, and 14934-83.
Decisions will be entered under Rule 155 *334 in dockets Nos. 14926-83, 14927-83, 14928-83, 14929-83, and 14930-83.
Footnotes
1. The following cases were consolidated for trial, briefing, and opinion: George A. Kloppenberg and Zona B. Kloppenberg, Docket No. 14927-83; George F. Kloppenberg and Helen S. Kloppenberg, Docket No. 14928-83; Joseph R. Kloppenberg and Mary C. Kloppenberg, Docket No. 14929-83; James T. Kloppenberg and Mary C. Kloppenberg, Docket No. 14930-83; Laura A. Kloppenberg, Docket No. 14931-83; Christine A. Kloppenberg, Docket No. 14932-83; Brian A. Kloppenberg, Docket No. 14933-83; and Paul A. Kloppenberg, Docket No. 14934-83.↩
2. Laura A., Christine A. Brian A. and Paul A. Kloppenberg, all of whom were minors in 1978, are petitioners herein solely because their father, petitioner George F. Kloppenberg, made a gift of 6 shares of GAZB stock to each prior to the challenged transaction.↩
3. TGP acquired the Oxford property burdened by the outstanding lease to Kloppenberg Co. On acquisition by the latter the leasehold interest merged with the interest subject to the lease with the result that Kloppenberg Co. then owned the fee simple interest.↩
4. Respondent concedes that Kloppenberg Co. is entitled to additional depreciation deductions as a result of the May 3, 1978 transaction for that portion of the purchase price allocable to the Oxford building. The parties have not, however, agreed on the amount of these additional deductions. ↩
5. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
6. These stock transfers were made to George F. Kloppenberg as custodian for each child.↩
7. The Oxford building was designed to maximize the efficiency of the Kloppenberg Co. manufacturing operation. It had a reinforced heavy duty floor which was "dead level" to facilitate the manufacture of cafeteria counters and other flat metal surfaces. Other features of the building include extensive electrical wiring throughout and a heavy duty roof and suspension system which supports a monorail-type crane with a power lift. The building was designed with expansion joints so that future expansion could be easily accomplished and integrated with the existing building. During construction, caissons going 20 feet into the ground were placed every 10 feet in that portion of the building located over a previously filled dump site. Although these features increase the value of the Oxford property to Kloppenberg Co., they did not increase its fair market value.
8. The method used consisted of capitalizing the present worth of the anticipated net income before recapture for the remaining term of the lease and valuing GAZB's reversion interest in the land and building by discounting its anticipated value to its present worth.↩
9. Respondent asserts that the fact that the forms were signed under penalty of perjury constitutes some sort of conclusive presumption that the plan was adopted. It is clear from the record that such a presumption is contrary to fact. Further, it is irrelevant that the forms were signed under penalty of perjury as they were never carried into effect by delivery.↩
10. Before entering this lease, George A. Kloppenberg checked on the financial status of Rose via inquiries to its bank and a visit to Rose's premises. He also obtained Rose's financial statements when the lease was executed. Similarly, prior to entering the lease, Schmidt investigated the background, financial capacity, and reputation of the Kloppenbergs. The record does not indicate the extent of Schmidt's investigation. No supplemental investigation was done by either party concerning the other prior to the challenged transaction.↩
11. TGP was formed by Schmidt, Sharp and members of their families in March 1978. Schmidt was the managing partner of TGP. ↩
12. The transaction was initially scheduled to be consummated on May 1, 1978 and some documents executed by the parties bear that date. It is clear from the record, however, that all of the relevant documents were executed on May 3, 1978.↩
13. A similar option contract had been entered by TGP with an unrelated party on April 4, 1978, concerning the Elati property with a stated purchase price of $50,000. This option contract was relatively unimportant to the transaction between TGP and the Trust. As Schmidt stated, if such contract had not existed on May 3, 1978, TGP "could have found some way to use the property or sell it or lease it."↩
14. The balance of the purchase price was allocable to accounts receivable and cash.
15. Although the fourth note, in the amount of $23,600, was not specifically secured by the accounts receivable, as payment was received on any account receivable, an immediate and corresponding payment by TGP to the Trust was required. Further, this note was payable within 3 months and the Trust warranted that the accounts receivable were collectible within 3 months and that, on breach of any warranty, TGP was entitled to a dollar-for-dollar reduction in or offset against the purchase price or outstanding balance of any note. Consequently, TGP's only risk on this note was the difference between its interest on the note to the Trust (8-3/4 percent) and the interest on the accounts receivable which were warranted to bear interest at "no less than 6 percent." This note was paid in full on June 5, 1978.
16. As Kloppenberg Co. held the leasehold interest in the Oxford property prior to May 3, 1978, when it acquired the fee interest subject to said leasehold the doctrine of merger of title applied and it held a fee simple interest in said property.↩
17. A notice of deficiency which was identical, except for the address, was sent to petitioners James T. and Mary C. Kloppenberg on April 11, 1983.↩
18. Respondent miscasts his motions as requests to amend the pleadings to conform to the evidence pursuant to Rule 41(b). This subsection is inapplicable as none of the requested amendments constitute issues tried by express or implied consent nor was evidence received over an objection that it was not within the ambit of the issues raised by the pleadings. Therefore, respondent's motions will be considered as made pursuant to Rule 41(a). A motion pursuant to that rule requires that the "motion for leave to amend a pleading shall state the reasons for the amendment and shall be accompanied by the proposed amendment." Respondent has failed to meet this requirement choosing instead to merely request such amendments on brief.
19. Correct allocation of the constructive dividend is complicated here because the shareholdings in GAZB were not in the same proportions as those in Kloppenberg Co., even ignoring the transfer to the four children of George F. Kloppenberg. Respondent has cited no precedent for his requested reallocation. A reallocation to George F. Kloppenberg alone might have merit given his gift to his children shortly before the May 3, 1978, transaction. However, respondent has not advocated this singular reallocation and, therefore, we need not consider it. 20. As respondent has conceded that individual petitioners Laura A., Christine A., Brian A., and Paul A. Kloppenberg could not receive constructive dividends from Kloppenberg Co. since they were never shareholders of that corporation. We must hold for these petitioners on the issue of constructive dividends from Kloppenberg Co.↩
21. Although we choose not to do so, respondent's counsel's statements could be taken as "the equivalent of a stipulation." Church of Scientology v. Commissioner,83 T.C. 381, 524↩ (1984).
22. During trial, the Court commented on an alternative structure of the transaction which might have accomplished petitioners' objectives. Respondent misconstrues this speculation as an alternative method of analysis proposed by the Court. This alternative would result in the disallowance of installment reporting by petitioners. However, neither petitioner nor respondent has argued for adoption of this analysis. Consequently, we need not consider respondent's "courtesy" argument concerning this alternative.
23. On brief respondent states that "[o]ther issues related to the remaining useful life of the remainder interest in the Oxford property building and the appropriate depreciation method were not presented to the Court during trial. These issues could potentially be resolved through use of Tax Court Rule 155." The useful life and depreciation method used by petitioners were not challenged by respondent before or during trial. Just as issues raised for the first time on brief are not properly before the Court, new issues or matters not presented during trial will not be considered in a Rule 155 computation. Rule 155(c). Bankers Pocahontas Coal Co. v. Burnet,287 U.S. 308 (1932); Cloes v. Commissioner,79 T.C. 933↩ (1982).
24. It is perhaps open to question whether a purchaser of the Oxford property would be able to enforce the increrased rent of $1,500 per month or be limited to the rent of $1,000 per month specified in the lease.Neither party has provided controlling authority on this point. However, respondent's appraisals assume an enforceable rent of $1,500 per month. This assumption is favorable to petitioners in that a lower rent would result in a lower fair market value.↩
25. George A. Kloppenberg testified in that, in his opinion, the features of the Oxford building did not add to the economic success of Kloppenberg Co. Petitioners themselves do not appear to embrace their counsel's argument as to special use value.↩
26. Petitioners mischaracterize respondent's objection to the form of the transaction stating that "[r]espondent urges this Court to reject the form of the transaction only because Petitioners could have simply had GAZB Corporation sell Tejon Property directly to Tejon General Partnership, and such direct route was not taken only because of a desire to avoid the heavy tax bite." In fact, respondent's challenge to the form of the transaction relates solely to the inflated purchase price for the Oxford property and the structure of the transaction to convert what would otherwise be ordinary income to capital gains.
27. Although we find that George F. Kloppenberg's children did not receive constructive dividends, petitioners failed to advance any argument as to the consequences of this finding on Kloppenberg's interest deduction. As petitioners bear the burden of proving respondent's determination incorrect, we will not attempt to construct arguments or speculate concerning facts it was petitioners' burden to proffer. ↩
28. Since petitioners have not advanced any argument that execution of the note was the equivalent of a dividend declaration and therefore the interest deductions were proper, we express no opinion as to the merit of such an argument.↩
29. At trial petitioners raised an argument that the consents executed on behalf of his four children by George F. Kloppenberg were not valid. The Court admonished petitioners' counsel that resolution of this issue would depend on his bringing controlling precedent and applicable law to the Court's attention. As petitioners abandoned this argument on brief, we deem it conceded. In any event, because the children were never shareholders of Kloppenberg Co., we have held for them on the issue of constructive dividends from that corporation.↩