RICHARD E. SHEA AND WENDY SHEA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shea v. Commissioner
Docket No. 11385-89
United States Tax Court
T.C. Memo 1991-518; 1991 Tax Ct. Memo LEXIS 565; 62 T.C.M. (CCH) 1027; T.C.M. (RIA) 91518; October 15, 1991, Filed *565 Decision will be entered under Rule 155. Albert L. Grasso and Steven B. Wolf, for the petitioners. Vijay S. Rajan and Joseph T. Ferrick, for the respondent. HAMBLEN, Judge. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency and additions to tax in Richard E. and Wendy Shea's (petitioners) 1983 Federal income tax as follows: Additions to Tax under Sec. [1]
Deficiency
6653(a)(1)
6653(a)(2)
$ 29,912
$ 1,496
50% of interest
due on $ 29,912
Respondent also determined that petitioners' underpayment in their 1983 Federal income tax was substantial and due to a tax-motivated transaction under section 6621(c). [2] Therefore, respondent determined that the increased interest rate was applicable. *566 The issues to be decided are: (1) Whether petitioners invested in a sham transaction having no business purpose aside from tax savings; (2) whether petitioners were at risk within the meaning of section 465 for any part of their investment in GTE Trust; (3) whether petitioners are liable for additions to tax for negligence under section 6653(a); (4) whether petitioners' investment in GTE Trust was a tax-motivated transaction within the meaning of section 6621(c); and (5) whether respondent is barred by the 3-year period of limitations in which to assess tax. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, its supplement, and the exhibits attached to each are incorporated herein by this reference. Petitioners resided in Glencoe, Illinois, at the time the petition in this case was filed. Petitioners filed their Federal individual income tax return for the taxable year 1983 with the Kansas City Service Center. Richard E. Shea (petitioner) is a certified public accountant and law school graduate. At the time the petition was filed in this case, petitioner was the managing partner of a small local certified public accounting *567 firm which routinely rendered auditing, accounting, and tax services for its clients. In the course of his employment, petitioner routinely reviewed and prepared financial statements, provided income tax advice, prepared Federal income tax returns, and reviewed investment alternatives for his clients. The investment advisory services performed by petitioner included the evaluation of real estate, equipment leasing, oil and gas, and other investments. Petitioner's income in 1982 was in excess of $ 200,000. Prior to his investment activities in this case, petitioner had made personal investments in real estate limited partnerships, oil and gas transactions, cable television, hotels, and casinos. However, petitioner had never invested in any equipment-leasing transactions. In the case at hand, petitioner invested in an equipment-leasing transaction involving many entities. For purposes of clarity, we will detail these entities, and the transactions among them, before setting forth petitioner's involvement and participation in the overall equipment-leasing transaction. 1. CMI's Purchase of the Equipment and Incurrence of the DBT Debt
On November 1, 1982, CMI Corporation, *568 a Michigan corporation (CMI), purchased a central processing unit and related peripherals (the Equipment) from International Business Machines Corporation. The purchase included the following equipment: Machine Type
Model
Serial No.
Description
3081
D24
20309
Processor
3082
016
20309
Processor Controller
3087
001
20309
Coolant Distribution
Unit
3278
A02
25L75
Display Console [3]
CMI's purchase of the Equipment was financed with a secured loan from DBT Financial Services Corporation, a Michigan corporation (the DBT loan and DBT, respectively). The DBT loan was evidenced by an installment note and an assignment of lease and security agreement to DBT, both dated November 1, *569 1982 (the DBT Installment Note and the DBT Assignment of Lease, respectively). The DBT Installment Note, signed by CMI in favor of DBT, provides as follows: Notwithstanding anything to the contrary herein contained, the undersigned shall have no personal liability for the payment of this Note, or any part hereof (and, without limiting the generality of the foregoing, in the event of any default in making any payment hereunder, no personal judgement, by way of deficiency or otherwise, shall be sought or recovered against the undersigned), all such liability hereunder being expressly waived by the payee and each taker and holder thereof, it being understood that this Note shall be payable solely out of the rental payments and other sums payable under lease described in said Assignment and Security Agreement and out of a sale of the collateral which is the subject of said Lease.
The DBT Installment Note required 59 monthly payments. The first 22 monthly payments were in the amount of $ 96,765 followed by 37 payments of $ 67,710. Under the DBT Assignment of Lease, CMI assigned to DBT all of CMI's rights, title, and interest in the Equipment and the User Lease described herein, *570 infra. 2. CMI Leases the Equipment to GTE
CMI leased the Equipment to GTE Automatic Electric, Inc. (GTE). The terms of the lease were set forth in an equipment lease, dated April 5, 1982 (the User Lease). The User Lease was a net lease, requiring GTE, at its expense, to insure, pay all associated taxes, bear the risk of loss, maintain, and repair the Equipment. The payments under the User Lease were identical to those under the DBT Installment Note. Further, GTE made its lease payments directly to DBT, thereby servicing CMI's debt obligation to DBT for the initial purchase of the Equipment. 3. CMI Sells the Equipment and Assigns the Lease to TFG
On December 29, 1982, CMI, subject to the DBT loan, sold the Equipment and assigned the User Lease to Technology Finance Group, Inc., a Delaware corporation (TFG). A purchase and sale agreement between CMI and TFG, dated December 29, 1982, provided that TFG would pay CMI $ 3,755,000 by tendering cash and by assuming the debt obligation which CMI owed to DBT. In addition to the $ 3,755,000 cash payment and debt assumption, TFG paid CMI seller's fees equal to the sum of $ 132,717 and 50 percent of the net proceeds *571 which accrued on account of the Equipment. "Net proceeds" was defined in the purchase and sale agreement as: (a)(i) the rental payments paid by third party user lessees (the "Users") pursuant to user leases (the "User Leases") between Buyer or any of its successors in interest in the Equipment (including, without limitation, TG Associates Limited Partnership ("TG") or Buyer's or TG's agents), as lessor, and the Users, as lessees (including without limitation, the User under the Lease), plus (ii) all remarketing fees received by Buyer or any of its successors in interest in the Equipment (including, without limitation, TG or Buyer's or TG's agents) as a result of remarketing the Equipment for the purchase/lessor (the "Owner") with whom Buyer or any of its successors in interest in the Equipment (including, without limitation, TG or Buyer's or TG's agents) intends to enter into a sale/leaseback transaction concerning the Equipment and from the Owner's successors in interest in the Equipment or the User Leases plus (iii) all other amounts received by Buyer or any of its successors in interest in the Equipment (including, without limitation, TG or Buyer's or TG's agents) on account *572 of the Equipment or its use (including, without limitation, sales, loan or insurance proceeds), but excluding, however, any proceeds, including interest thereon, derived by Buyer from the sale of the Equipment to TG, Owner or any party or parties which, directly or indirectly sell the Equipment to the Owner, after (b) deduction from the foregoing amounts referred to in (i), (ii) and (iii) above for amount paid, at or prior to the time the amount referred to in (i), (ii) and (iii) above are received, (w) by the lessors under the User Leases in respect of taxes (other than income taxes of lessor), maintenance, repairs, transportation, brokerage, insurance, installation and deinstallation, (x) by the lessors under the User Leases to the Users, (y) in respect of the Lien and (z) in respect of any other direct costs and expenses accrued on account of the Equipment except for payments made to Owner under the lease between Owner and Buyer or any of its successors in interest in the Equipment (including, without limitation, TG or Buyers or TG's agents).
TFG executed a security agreement, dated December 29, 1982, in favor of CMI to secure TFG's performance under the purchase and sale agreement. *573 The security agreement granted a security interest in the Equipment, all leases of the Equipment, and all proceeds from the Equipment. CMI and TFG also entered into a subordination agreement, dated December 29, 1982. In the subordination agreement, TFG agreed to be bound by all of the obligations and undertakings of CMI under the DBT Assignment of Lease between CMI and DBT. TFG also acknowledged that its ownership interest in the Equipment was in all respects subject and subordinate to the security interest granted to DBT by CMI. Further, CMI and TFG agreed that, except for breaches of the representations and warranties by TFG, no recourse shall be had against TFG under or in respect of the December 29, 1982, security agreement evidencing the security interest. As to TFG all obligations related to the sale of the Equipment and transfer of lease were nonrecourse obligations enforceable only against the Equipment. The subordination agreement between CMI and TFG was binding upon the successors and assigns of TFG and inured to the benefit of, and was enforceable by, the successors and assigns of DBT. CMI and TFG also entered into a remarketing agreement in which TFG irrevocably *574 appointed CMI its agent to remarket the Equipment at the conclusion of the User Lease. CMI entered into this agreement in order to maximize the re-lease rentals and residual proceeds payable to it pursuant to its purchase and sale agreement with TFG. TFG was to pay CMI the fair market value of any services CMI rendered under the remarketing agreement. 4. TFG Sells the Equipment and Assigns the Lease to TG
On December 31, 1982, TFG, subject to the DBT loan, sold the Equipment and assigned the User Lease to TG Associates Limited Partnership, a Connecticut limited partnership (TG). TG's general partners are wholly owned subsidiaries of TFG. TG paid TFG cash and assumed the balance of the DBT loan. TG also paid TFG fees equal to 50 percent of the net proceeds received by TG after December 31, 1982. The agreement between TFG and TG defined net proceeds as follows: For purposes hereof, the term "Net Proceeds" shall mean (x) the rental payments (the "User Rentals") paid to or in [sic] behalf of Buyer by lessees under leases ("User Leases") between Buyer, its predecessors in interest or its agents, as lessor, and third party users, as lessees, (including, without limitation, *575 the Lease), (y) all remarketing fees received by Buyer as a result of remarketing the Equipment for the purchaser/lessor (the "Owner") with whom Buyer intends to enter into a sale/leaseback transaction concerning the Equipment and from the Owner's successors in interest in the Equipment or the User Leases and (z) all other amounts received by Buyer on account of the Equipment or its use (including without limitation, sales, rental, loan or insurance proceeds and note payments) after deduction from the foregoing amounts referred to in (x), (y) or (z) above for (i) the amount by which the purchase price paid by Buyer * * * exceeds the Lender's Lien (ii) amounts paid by Buyer in respect of taxes, maintenance, repairs, transportation, brokerage, insurance, installation, deinstallation, (iii) amounts paid by Buyer to such lessees, (iv) portions of User Rentals paid by Buyer to Seller's predecessors in interest * * * (v) payments made to the lessor as provided in the lease between Owner, as lessor, and Buyer, as lessee (the "Owner Lease"), except that no deduction shall be made for any payment representing the fixed net cash flow to such lessor * * *, (vi) payments in respect of Lender's *576 Lien, (vii) fees paid to Seller * * * hereof and (viii) all other direct costs and expenses accrued by Buyer on account of the Equipment. * * *
As security for TG's payment and performance of its obligations, TG granted to TFG a lien and security interest in and to all its rights in and to the Equipment, the owner documents, all other agreements calling for the disposition of the Equipment, and all proceeds therefrom. On buying the Equipment, TG assumed all the obligations of TFG under the User Lease, the DBT loan, and the lien in favor of CMI given by TFG. However, since TFG's liability was not personal, TG's liability was limited to its interest in the Equipment and the User Lease. In other words, TFG could look only to the Equipment for collection in the event of default. 5. TG Sells the Equipment and Assigns the Lease to TSC
TG entered into a purchase agreement, dated December 31, 1982, in which TG sold the Equipment to Technology Sales Corporation, a Connecticut corporation (TSC). TSC is a wholly owned subsidiary of TFG. TG's sale of the Equipment to TSC was subject to the User Lease and the security interests of DBT, TFG and TG. TSC paid the $ 3,755,000 purchase *577 price by tendering cash, executing short-term promissory notes, and executing a $ 3,567,250 installment promissory note. The installment promissory note provided for the following payment schedule by TSC to TG: (a) $ 24,000 as interest on December 31, 1982; (b) $ 232,903 as interest on June 15, 1983; (c) $ 232,903 as interest on June 15, 1984; (d) $ 32,543.27 as interest on January 31, 1983, and for the following 29 months; and (e) $ 81,612.03 as interest and principal on July 31, 1985, and for the following 65 months. The installment promissory note further provided that with respect to $ 597,250 of the note, together with interest accruing thereon, TG would look solely to the collateral for payment and that TG, its successors, and assigns would be bound by this agreement. 6. TSC Leases the Equipment Back to TG
Simultaneously with the purchase of the Equipment by TSC, TSC leased the Equipment back to TG for a term of 96 months (the Leaseback Lease) subject to the User Lease and the security interests of DBT, TFG, and TG. The Leaseback Lease provided for fixed rent payments of $ 32,543.27 for the first 30 months and $ 81,612.03 thereafter until expiration of the *578 lease. In addition to the fixed lease payments, TG agreed to pay TSC additional rent equal to 50 percent of the net (re-lease) rentals and residual sales proceeds upon termination of the User Lease. "Net rentals" was defined in the lease agreement as: the rental payments paid to Lessee by lessees under the Underlying Leases after deduction for sales, use, property or other taxes (other than taxes based upon net income), maintenance, repairs, transportation, brokerage, insurance, installation and all other direct costs and expenses accrued by Lessee on account of the Equipment, together with interest thereon (at the rate of 17% per annum) from the date such costs and expenses are incurred to the date rental payments sufficient to reimburse Lessee therefore are received. Such percentages of Net Rentals payable as Additional Rent hereunder shall be payable solely out of and only to the extent Net Rentals are actually received by Lessee from lessees under Underlying Leases * * *.
TG assumed all risk of loss and paid all taxes, maintenance, and insurance costs. Under a collateral assignment of leases dated December 31, 1982, TG assigned to TSC all its rights, title, and *579 interest in the existing leases of the Equipment, subject to the existing security interests. 7. TSC Sells the Equipment and Assigns the Lease to GTE Trust
On December 31, 1982, GTE Trust, a Connecticut trust organized in 1982, purchased the Equipment from TSC for $ 3,755,000 subject to the User Lease, the Leaseback Lease, and the security interests of DBT, TFG, and TG. GTE Trust was created by Jerry Minsky, who was also the trustee of GTE Trust. TSC assigned all of its rights under the Leaseback Lease to GTE Trust, and GTE Trust assumed all of TSC's obligations under the Leaseback Lease. GTE Trust paid the $ 3,755,000 purchase price by tendering cash, executing short-term promissory notes, and executing a $ 3,567,720 installment promissory note. The installment promissory note provided for the following payment schedule by GTE Trust to TSC: (a) $ 24,000 as interest on December 31, 1982; (b) $ 232,903 as interest on June 15, 1983; (c) $ 193,699 as interest on June 15, 1984; (d) $ 32,543.27 as interest on January 31, 1983, and for the following 29 months; and (e) $ 81,612.02 as interest and principal on July 31, 1985, and for the following 65 months. The installment *580 promissory note further provided that only $ 2,970,000 of principal together with interest thereon was recourse. TSC, its successors, and assigns were bound by this agreement. In the event the lease between TSC and TG was terminated, payment of all remaining amounts of principal and interest under the installment promissory note given by GTE Trust to TSC was to be deferred without interest thereon until December 31, 1992. The terms and conditions provided in the short-term promissory notes for the respective amounts given by GTE Trust to TSC are similar, in all material aspects, to those provided in the short-term promissory notes given for the same amounts by TSC to TG. The terms and conditions of the installment promissory note given by GTE Trust to TSC are similar, in all material aspects, to those provided in the installment promissory note given for the same amount by TSC to TG. 8. Transaction Overview
For purposes of clarity, it is important to note that at all relevant times TFG, TG, TSC, and GTE Trust were closely related affiliates. The Equipment was successively owned by International Business Machines Corporation, CMI, TFG, TG, TSC, and GTE Trust. During *581 the period the User Lease was in effect, the following parties exchanged the same amount of moneys every month in a circular manner: (i) TSC to TG; (ii) TG to GTE Trust; (iii) GTE Trust to TSC. 9. Petitioners' Investment
Petitioner was contacted by Mr. Jack Curry, an employee of TFG, with the idea of investing in equipment-leasing transactions through investment in GTE Trust. GTE Trust offered 18 units for investment. The investors were to have only a passive role in the management of GTE Trust's business. Petitioner did not know Mr. Curry prior to Mr. Curry's solicitation of petitioner's participation in GTE Trust. After his initial contact with Mr. Curry, petitioner undertook to familiarize himself with respect to equipment-leasing transactions. GTE Trust set forth all relevant information with respect to investment in GTE Trust in a confidential memorandum (offering memorandum) which it provided to petitioner and other potential investors. The offering memorandum explained that the investment was suitable only for individual investors who had substantial net worth and substantial taxable income, who were not seeking substantial current cash return on their investment, *582 and whose marginal Federal tax bracket applicable to this investment was, and was expected to continue to be, at least 50 percent. Petitioner examined this offering memorandum, read tax journals, studied tapes, attended courses sponsored by the American Institute of CPA's, and had numerous conversations with Mr. Curry regarding IBM Equipment, the appraisal report contained in the offering memorandum, the terms of the User Lease, and TFG's equipment-leasing experience. Petitioner also obtained the name of previous customers of TFG and their advisers. One of the advisers' names provided to petitioner was Marty Trossman, a certified public accountant in Buffalo, New York, who shared a common client with petitioner. Petitioner contacted Mr. Trossman for purposes of discussing a possible investment in GTE Trust. Mr. Trossman told petitioner that TFG had been in business since the early 1970's and had leased equipment with a value in excess of $ 1 billion. After completing his investigation, petitioner and his wife invested in GTE Trust. Petitioner also recommended the investment to two of his individual clients. When petitioner decided to invest in GTE Trust, he knew that TFG, *583 TG, TSC, and GTE Trust were closely related affiliates. Petitioner further knew that Jerry Minsky represented all the related entities involved in the structuring of the equipment-leasing program. He also knew that Mr. Minsky was executing documents on behalf of TFG, TG, TSC, and GTE Trust. On February 23, 1983, petitioner subscribed for and purchased one investment participation unit in GTE Trust. He paid the $ 35,464 purchase price by tendering to Mr. Minsky, as trustee for GTE Trust, a $ 3,000 check and by executing two recourse short-term promissory notes totaling $ 32,464. Payment of the promissory notes was secured by irrevocable letters of credit issued by LaSalle National Bank, Chicago, Illinois. Petitioner also asserts that he is also liable for his proportion (1/18 of $ 2,970,000) of GTE Trust's debt, payable to TSC, a subsidiary of TG, in the amount of $ 165,000 in making his investment in GTE Trust. Petitioner was aware that, if he was not at risk on some portion of his investment, he was not entitled to claim deductions attributable to the amount for which he was not at risk. On February 28, 1989, respondent mailed a notice of deficiency to petitioners for the *584 taxable year ended December 31, 1983. In the deficiency notice, respondent disallowed petitioners' claimed deductions as they related to their investment in GTE Trust. On May 30, 1989, petitioners filed a timely petition for a redetermination of the deficiency and additions to tax. At trial, both petitioners and respondent produced expert testimony regarding whether rental receipts from re-leasing the Equipment at the end of the User Lease along with the Equipment's residual value at the end of the re-lease term would return a profit to the investors in GTE Trust. Petitioner utilized an appraisal report (attached to the Offering Memorandum), prepared by Donald Lassoff of Don Allen Computer Company, to show that each investor in GTE Trust could expect to receive an economic profit of $ 11,463.50 for each GTE Trust investment unit. Petitioner also utilized the services of Ralph Page of Marshall & Stevens, Inc. Mr. Page performed a retrospective desktop investigation of the Equipment contemporaneous to the date of GTE Trust's acquisition of the Equipment. Mr. Page's computations set forth that the Equipment would have a residual value of 29 percent of the purchase price at the *585 expiration of the User Lease and a residual value of 13 percent of the purchase price at the end of a subsequent 3-year re-lease. Utilizing these percentages, Mr. Page concluded that the figures set forth in Mr. Lassoff's appraisal report, attached to the Offering Memorandum, were extremely accurate. S. Paul Blumenthal of American Technology Appraisal Service testified on behalf of respondent. Mr. Blumenthal utilized several different methods and established that under any of the various methods he employed no reasonable opportunity for profit could be justified from an investment in GTE Trust. OPINION Respondent determined that petitioners invested in a transaction, GTE Trust, that had no valid business purpose and was established solely for tax avoidance purposes. Respondent points to GTE Trust's own offering memorandum as proof that tax concerns were the major consideration for potential investors in GTE Trust. The offering memorandum set forth that only people in the higher tax brackets who anticipated remaining in those brackets should consider investing in GTE Trust. Petitioner argues that he had a valid business purpose in investing in GTE Trust. Petitioner acknowledged *586 that there were favorable tax attributes to his investment, but contends the investment would return a profit to petitioners above and beyond the tax savings. Petitioner points to his knowledge and experience as a certified public accountant and to his extensive research in GTE Trust before his investment as evidence that he expected to make a profit on his investment at the time he invested. Respondent also determined that petitioners were not at risk within the meaning of section 465 on their investment in GTE Trust. Respondent contends that TSC was a mere conduit through which TG carried on business with GTE Trust and, therefore, that TSC should be disregarded. Consequently, respondent asserts that GTE Trust and petitioner actually borrowed money from TG, a company which had an interest in the activity other than as a creditor. Respondent accordingly determined that petitioners were not at risk within the meaning of section 465. Petitioner argues that TSC cannot be ignored as forming part of the transaction. Petitioner acknowledges that he borrowed money via the promissory notes and the assumption of GTE Trust's debt from TSC. However, petitioner asserts that TSC is not *587 TG. Petitioner further asserts that, since TSC does not have an interest in the activity other than as a creditor, petitioners' deductions with respect to their investment in GTE Trust were proper. Respondent further determined that petitioners were subject to additions to tax for negligence under section 6653(a). Finally, respondent determined that the increased interest under section 6621(c) was appropriate since petitioners' underpayment was substantial and was due to a tax-motivated transaction. Petitioners deny that they were negligent with respect to the deductions they claimed for the taxable year at issue. Petitioners further deny that any underpayment exists, and, if one is found to exist, petitioners contend that it was not due to a tax-motivated transaction but, rather, resulted from a transaction that had a valid business purpose. 1. Valid or Sham Transaction
Taxpayers are generally free to structure their business transactions as they please, though motivated by tax-reduction considerations. Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. on this *588 issue 752 F.2d 89 (4th Cir. 1985). However, it is well settled that a transaction which is entered into solely for the purpose of tax reduction and without economic, commercial, or legal purpose other than the expected tax benefits is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 196; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1243 (1981). Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra; Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). In the sale and leaseback context, we set forth a standard that the nonuser-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 201-203. *589 In Rice's Toyota World, we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 196. Our inquiry of business purpose and economic substance is inherently factual as indicated in several recent cases concerning sale and leaseback transactions of computer equipment. Torres v. Commissioner, 88 T.C. 702 (1987); Bussing v. Commissioner, 88 T.C. 449 (1987), supplemented by 89 T.C. 1050 (1987); Gefen v. Commissioner, 87 T.C. 1471 (1986); Mukerji v. Commissioner, 87 T.C. 926, 968 (1986); James v. Commissioner, 87 T.C. 905 (1986); Estate of Thomas v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, supra.
We note here, as we did in Rice's Toyota World, that the drawing of a precise line of demarcation between valid and invalid transactions is invariably difficult. See Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 197. *590 In this context, petitioners bear the burden of proof, as respondent's determination that the transaction was a tax avoidance scheme, devoid of economic substance, is presumptively correct. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). In the case at hand, we are satisfied that petitioner held the requisite business purpose necessary to justify the transaction. Petitioner impressed us as an intelligent and articulate witness with a certain degree of business acumen. Petitioner, utilizing his legal and accounting background, independently investigated and critiqued the computer-leasing investment and found it to be sound. The facts bear out that petitioner made an investment business decision based on all of the relevant facts at hand. Petitioner contacted several individuals and made extensive inquiries into the soundness of investing in GTE Trust. Petitioner further studied the offering memorandum and numerous outside sources before coming to his decision to invest. The fact that some or all of the information he received was inaccurate does not negate petitioner's efforts in attempting to ascertain the profit potential of the transaction. We *591 find the record is sufficient to support petitioner's claim that he invested in GTE Trust with the reasonable opportunity of making an economic profit above and beyond any possible tax savings that may have been associated with the investment. Respondent's expert, Mr. Blumenthal, testified that the appraisals set forth in GTE Trust's offering memorandum suffered from two major defects. First, Mr. Blumenthal asserted that the stated fair market value of the Equipment as of December 1982 was not consistent with the published figures. Next, Mr. Blumenthal asserted that the residual value of the Equipment, as projected in the offering memorandum, was inconsistent with the available history in 1982. We further find Mr. Blumenthal's testimony regarding the transaction's economic substance to be unpersuasive. Mr. Blumenthal utilized a myriad of methods in reaching his conclusion that the equipment-leasing transaction lacked economic substance. Mr. Blumenthal, through his testimony, demonstrated that there are many methods that can be used to determine economic substance. Respondent, on brief, even admits that one of these methods might have indeed returned an economic profit, although *592 minimal. Mr. Blumenthal has been before this Court as an expert witness on other occasions. We find it interesting that in Larsen v. Commissioner, 89 T.C. 1229 (1987), affd. in part, revd. in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360, 1364-1365 (9th Cir. 1990), Mr. Blumenthal, while testifying on behalf of the taxpayers, found a piece of equipment, comparable to one we are dealing with here, to have a useful life of 12 to 15 years while he now, testifying for respondent, finds the equipment to have a useful life of only 7 to 10 years. We find that throughout his testimony, Mr. Blumenthal discarded his impartiality and became an advocate for respondent's position. Accordingly, we afford little weight to his testimony. See Estate of Halas v. Commissioner, 94 T.C. 570 (1990). Petitioners have established that the transaction in question had economic substance. Petitioner has demonstrated that the $ 165,000 of debt he assumed from GTE Trust would be paid over the life of the lease by the lease payments. In order to show that the transaction at issue had economic substance, petitioner must further establish *593 that his portion of the re-lease payments and residual value of the Equipment exceeds his initial $ 35,464 investment of cash and short-term notes. Mr. Lassoff's projections in the appraisal report demonstrated that GTE Trust could expect to realize $ 469,875 from the re-lease rentals and an additional $ 375,000 from the sale of the Equipment at the end of the re-lease term. This total of $ 844,875 must be divided by GTE's 18 investment units before comparing the expected return to petitioners, as holders of one investment unit, against their initial investment. Mr. Lassoff's figures indicate that petitioners could expect to receive $ 46,937.50 as their share of re-lease income and residual value on their initial investment of $ 35,464. This results in an economic profit of $ 11,463.50 over the economic life of the equipment. Mr. Page's independent computations verify this result. We find, based on the record before us and based upon our determination of the credibility of the witnesses before us, that economic substance existed in the equipment-leasing transaction. 2. Amounts at Risk
Having found that petitioners invested in GTE Trust with the requisite business purpose *594 and having found that the equipment-leasing transaction had economic substance, we must next consider whether petitioners had any of their investment at risk within the meaning of section 465. Respondent asserts that TG, not TSC, was the true lender of the funds invested by petitioners in GTE Trust. Respondent further asserts that since petitioner borrowed the funds he invested from TG, a party who had an interest in the activity of more than a mere creditor, none of the borrowed amounts were at risk. Therefore, in order to decide the ultimate question of what amounts, if any, petitioner had at risk in his GTE Trust investment, we must also examine the status of TSC in the overall transaction. We have on a number of occasions considered whether an entity interjected into a transaction is placed in the transaction as a "strawman." See Bussing v. Commissioner, 88 T.C. 449 (1987), supplemented by 89 T.C. 1050 (1987); Tolwinsky v. Commissioner, 86 T.C. 1009 (1986); Packard v. Commissioner, 85 T.C. 397 (1985). We have disregarded such entities in those instances where no genuine suggestion of any business *595 purpose for the entity's insertion is forthcoming. See Tolwinsky v. Commissioner, 86 T.C. at 1037. Petitioners bear the burden of proving that each entity's presence should be respected. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933). In the case before us, the facts indicate that TSC served no valid business purpose. The terms and conditions provided in the agreements and promissory notes between GTE Trust and TSC are similar in all material respects to those provided in the same agreements and promissory notes between TSC and TG. TSC was merely a conduit through which TG carried on business with GTE Trust and petitioner. Petitioners have not met their burden of proof in establishing that TSC's participation in the equipment-leasing transaction was for any reason other than tax avoidance. Therefore, we find that TSC had no business purpose in the equipment-leasing transaction, and we will not recognize it for tax purposes. Consequently, our discussion of petitioners' amounts at risk in their GTE Trust investment must be viewed from the standpoint that TG, not TSC, was the true lender of the funds petitioner invested in GTE *596 Trust. Section 465 provides that, where an individual invests in certain activities, including the leasing of section 1245 property, any loss from such an investment shall be allowed only to the extent that the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1), (c)(1)(C). Borrowed amounts are considered to be at risk where, among other requirements, the amounts have been borrowed for use in the activity, and the taxpayer is personally liable for the repayment of the borrowed amounts or has pledged property, other than property used in the activity, as security for the borrowed amounts. Sec. 465(b)(2). Borrowed amounts are not at risk, however, insofar as "such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity." Sec. 465(b)(3)(A). In 1979, the Treasury issued proposed regulations under section 465(B)(3) which provide that creditors will be deemed to have prohibited interests if they have either a "capital interest" in the activity, or an interest in the "net profits" of the activity. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 *597 (June 5, 1979). [4] We have noted these two tests in determining whether any of the creditors in a transaction have prohibited other interests. Levy v. Commissioner, 91 T.C. 838, 867 (1988); Larsen v. Commissioner, 89 T.C. 1229, 1270 (1987), affd. on this issue sub nom. Casebeer v. Commissioner, 909 F.2d 1360, 1364-1365 (9th Cir. 1990); Jackson v. Commissioner, 86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). *598 In the case at hand, TG had a 50-percent interest in the net rentals it received after the expiration of the initial term of the User Lease. Net rentals was defined to include rental payments paid to TG by third party lessees after deduction for sales, use and property taxes, maintenance, repairs, transportation, brokerage, insurance, installation, other direct costs, and insurance. Since the definition of net rentals includes rental payments after the expiration of the term of the User Lease, we find that TG's interest included a portion of the residual value of the Equipment since any further leasing of the Equipment after the term of the User Lease would necessarily take into account the Equipment's value at the time of the new lease. Therefore, we find that TG had an interest in the activity other than as a creditor. TG also had an interest in the residual value of the Equipment thereby giving it a capital interest in the activity. See sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979); see also Bussing v. Commissioner, 88 T.C. at 463 n.14. Consequently, the proportional amount of GTE Trust debt that petitioners *599 assumed in making their investment and the amount of the two short-term promissory notes petitioners executed are not at risk within the meaning of section 465. See sec. 465(b)(3). However, petitioner testified that he paid $ 3,000 of the purchase price in cash. He further testified that he paid off the balance of the two short-term promissory notes totaling $ 32,464. Petitioners have the burden of proof in establishing that they are entitled to deductions greater than those allowed by respondent. Welch v. Helvering, supra; Rule 142(a). This burden of proof includes establishing both the right to and the amount of the deduction. Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 40 L. Ed. 2d 717, 94 S. Ct. 2129 (1974); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 78 L. Ed. 1348, 54 S. Ct. 788 (1934). With respect to the $ 3,000 cash that was paid, petitioners have adequately established that they were at risk under the provisions of section 465. The record is insufficient, however, to determine whether petitioners were at risk with respect to the two short-term promissory notes. Even assuming petitioner did pay off the notes, we do not know when *600 or in what form the payments were made. Therefore, petitioners have not met their burden of proof as to the amounts of the short-term promissory notes. Consequently, we find that they were not at risk on those amounts. Petitioners are only entitled to deductions relating to GTE Trust to the extent of the $ 3,000 they had at risk. [5]
3. Additions to Tax for Negligence
Respondent determined that petitioners are subject to the additions to tax for negligence since they claimed deductions from an investment that they knew was solely tax motivated. Section 6653(a)(1) provides for an addition to tax equal to 5 percent of the total underpayment if any part of the underpayment is due to negligence or intentional *601 disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the statutory interest due on the portion of the underpayment attributable to negligence. Negligence is defined as a failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that the underpayment determined by respondent was not due to negligence or intentional disregard of the rules and regulations. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972); Rule 142(a). Respondent's negligence argument is based on the assumption that we find the equipment-leasing arrangement to be solely tax motivated. We have not so found. Instead, we have found that petitioners entered into their GTE Trust investment with the requisite business purpose. We find that petitioners acted reasonably in making their investment and did not intentionally disregard the Internal Revenue Code's rules and regulations. Therefore, we find *602 that petitioners are not subject to the additions to tax for negligence for the taxable year 1983 relating to their GTE Trust investment. 4. Increased Interest Rate
Respondent determined that the increased interest rate under section 6621(c) is applicable to petitioners for the underpayment of tax attributable to petitioners' GTE Trust investment. Section 6621(c)(1) provides for an interest rate of 120 percent of the rate set forth in section 6621(b), with respect to any underpayment in excess of $ 1,000, which is attributable to a tax-motivated transaction. This section applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to that date. DeMartino v. Commissioner, 88 T.C. 583 (1987); Zirker v. Commissioner, 87 T.C. 970 (1986); Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent's initial argument that petitioners are subject to the increased interest rate of section 6621(c) is based upon respondent's assumption that we find the equipment-leasing arrangement to be *603 a sham and solely tax motivated. See sec. 6621(c)(3)(A)(v). Instead, we have found petitioners had the requisite business purpose when making their investment and that the transaction had economic substance. Therefore, respondent's initial argument fails. However, we have found that petitioners were not at risk within the meaning of section 465(a). In this regard, section 6621(c)(3)(A)(ii), in part, defines a tax-motivated transaction for purposes of section 6621(c)(1) as "any loss disallowed by reason of section 465(a)." It is clear from the record that the underpayment attributable to this tax-motivated transaction exceeds the $ 1,000 limit set forth in section 6621(c)(2). Therefore, the increased interest rate of section 6621(c)(1) is applicable to petitioners, for the taxable year at issue, for that portion of petitioners' investment in GTE Trust which we have found not to be at risk under section 465(a). 5. Three-Year Period of Limitation in Which to Assess Tax
Petitioners argue that assessment and collection of tax on their 1983 Federal tax return is barred by the 3-year period of limitations. On brief, petitioners correctly state that, generally, section 6501 *604 sets forth that a notice of deficiency must be sent to petitioners within 3 years of the time in which the return was filed. Petitioners state that they believe that GTE Trust timely filed its calendar year 1983 fiduciary income tax return. Petitioners then assert that respondent failed to issue his notice of deficiency to petitioners within the 3-year period of limitations applicable to the GTE Trust return. Therefore, petitioners argue that since their deficiency at issue is based upon a disallowance of their pro rata share of GTE Trust's expenses and since the period of limitations has run with regard to GTE Trust return for 1983, this action against them is also barred. Petitioners' argument is not well taken. Initially, we note that the record is devoid of any information of when GTE Trust filed its fiduciary return for the taxable year 1983. Petitioners have also neglected to set forth when GTE Trust's return was filed in their proposed findings of fact. Petitioners merely state in their brief that "On information and belief, GTE Trust timely filed" its 1983 return. Such a bare assertion without any substantiation in the record clearly does not meet petitioners' burden *605 of proof. Further, respondent is correct that petitioners had ample opportunity to address this issue from February 28, 1989, the date the notice of deficiency was issued, through June 26, 1990, the date of trial. Petitioners failed to do so. The first time this argument was brought forth was in petitioners' brief, filed September 27, 1990. An untimely amendment should be denied where no excuses for delay exist and there is prejudice or substantial inconvenience to the adverse party. Evans v. Syracuse City School District, 704 F.2d 44, 47 (2d Cir. 1983). [6]
We find that petitioners have failed to offer any proof to substantiate their claim that the 3-year period of limitations under section 6501 bars respondent's action in this case. Further, we find that petitioner had ample opportunity *606 to raise this issue in a timely fashion and failed to do so. Accordingly, we find that the 3-year period of limitations under section 6501 does not bar respondent's action in this case. CONCLUSION After review of the entire record in this case, we find that petitioners had the requisite business purpose at the time they invested in GTE Trust and that the investment had economic substance. We further find that petitioners were only at risk for the portion of the purchase price they paid in cash. Petitioners substantiated their $ 3,000 cash payment and cannot claim deductions for the taxable year at issue associated with their investment in GTE Trust to the extent they exceed $ 3,000. We also find that petitioners are not subject to the additions to tax for negligence under section 6653(a). We further find that petitioners are subject to the increased interest rate under section 6621(c) for the portion of underpayments resulting from losses petitioners claimed on amounts we have found to not be at risk within the meaning of section 465(a). Finally, we find that the 3-year period of limitations under section 6501 in which to assess tax is not a bar to respondent in this case. *607 We have examined both petitioners' and respondent's other arguments and find them unpersuasive and without merit. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code as amended and in effect for the taxable year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A) - (C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.↩
3. We note that, while CMI purchased the display console, it was not included in any subsequent sales or leases among the various parties involved in this equipment leasing transaction. Whether the display console should or should not be included in the equipment leasing transaction is immaterial for our analysis herein.↩
4. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979), provides, in relevant part: (b) Loans for which the borrower is personally liable for repayment. -- (1) General rule. If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity. (2) Capital interest. For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation. (3) Interest in net profits. For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.↩
5. We note that on brief respondent made several other assertions under other subsections of sec. 465 in coming to the conclusion that petitioners were not at risk on their investment in GTE Trust. However, since sec. 465(b)(3) is determinative of the issue, we need not address respondent's other assertions.↩
6. See also Manzoli v. Commissioner, T.C. Memo 1989-94, affd. 904 F.2d 101 (1st Cir. 1990); Kloppenberg and Co. v. Commissioner, T.C. Memo 1986-325↩.