115 T.C. No. 32

UNITED STATES TAX COURT


UNION CARBIDE FOREIGN SALES CORPORATION, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14641-97, 14642-97,      Filed November 8, 2000.
              14643-97, 11119-99.


       P leased an asset, and the terms of the lease
became onerous or burdensome. Under lease agreements,
P was entitled to either terminate the lease or
purchase the leased asset by the payment of a certain
sum. P chose to acquire the leased asset and, relying
on Cleveland Allerton Hotel, Inc. v. Commissioner, 166
F.2d 805 (6th Cir. 1948), revg. a Memorandum Opinion of
this Court dated May 7, 1947, seeks to bifurcate and
allocate the asset acquisition cost into two portions.
P asserts one portion should represent the value of the
leased asset without considering the value of the
existing lease. P further asserts that the remaining
portion should be allowed as a business deduction for

[1] Cases of the following petitioners are consolidated
herewith: UOP, Catalysts, Adsorbents and Process Systems, Inc.,
Tax Matters Partner, docket No. 14642-97; Union Carbide
Corporation and Subsidiaries, docket No. 14643-97; and Union
Carbide Corporation and Subsidiaries, docket No. 11119-99.

terminating a burdensome lease.  R contends that sec. 167(c)(2), I.R.C., enacted in 1993, requires that the acquisition cost must be allocated solely to the acquired tangible capital asset.  P contends that the holding of Cleveland Allerton Hotel, Inc. permits the allocation.

Held:  Sec. 167(c)(2), I.R.C., interpreted to prohibit allocation of any portion of the asset acquisition cost to a deduction for P's termination of a burdensome lease.

Harold J Heltzer, Philip F. McGovern, Jerry L. Robinson, and Howard Mark Weinman, for petitioners.

Steven R. Winningham, Joseph F. Long, Carmino J. Santaniello, S. Katy Lin, and Robin L. Peacock, for respondent.

OPINION

GERBER, Judge:  Respondent moved for partial summary judgment on the legal question of whether section 167(c)(2)[2] applies to petitioner's[3] acquisition of ownership of a previously leased oceangoing vessel.  Respondent contends that section 167(c)(2) would require petitioner to allocate to the depreciable asset all of its cost and, further, that petitioner was not entitled to allocate a portion of the cost to a deduction for

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the periods under consideration, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] References to "petitioner" in this group of related and consolidated cases refers to Union Carbide Corp., petitioner in docket Nos. 14643-97 and 11119-99.

relief from the terms of a burdensome lease. Petitioner argues that section 162 is applicable to the portion of the cost that it contends was attributable to buying its way out of an onerous or burdensome lease. Our consideration of whether section 167(c)(2) applies in these circumstances is a question of first impression.

### Background

For purposes of this motion for partial summary judgment,[4] the parties agree about the underlying facts and that this matter is ripe for consideration of the legal question. Although respondent generally questions the substance of this transaction, for purposes of the legal question presented in his motion, respondent accepts the form of and/or petitioner's explanation for the subject transaction. If respondent is unsuccessful in his motion, a trial will be necessary to address respondent's position regarding the substance of the transaction(s) and related issues including the basis of the vessel in question.[5]

The asset under consideration, the Chemical Pioneer is a seagoing vessel that was manufactured to petitioner's specifications for the transport of liquid chemicals. When the

---

[4] With the exception of what appears to be a computational issue, all other issues in these consolidated cases have been resolved by agreement of the parties.

[5] In addition, there are several procedural motions outstanding that we will need to address if the motion for partial summary judgment is not dispositive of the substantive issue.

vessel was completed during 1983, petitioner did not wish to show it as an asset on its balance sheet, so petitioner arranged a series of transactions that permitted it to lease rather than own the vessel. For purposes of the legal question we consider, it is only necessary to understand that petitioner leased the vessel and then, several years later, wanted to be relieved from the burdensome terms of the lease. Under the agreements, petitioner had the choice of paying either to terminate the lease or to acquire the vessel. Petitioner chose to acquire the vessel under the terms of the agreements. By acquiring the vessel, however, petitioner effectively terminated the burdensome lease.

We describe the following transactional steps employed for purposes of completeness: (1) The vessel was transferred to a trust created by Merrill Lynch Leasing, Inc. (Merrill Lynch), and of which Bankers Trust Co. (Bankers) was trustee; (2) Bankers, as trustee, entered into a Bareboat Charter[6] through January 3, 2004, (20 years) with a partnership named Union Marine Transport Co. (UMTC), which consisted of two equal partners--petitioner's subsidiary, Chemical Marine Fleet, Inc., and a subsidiary of Marine Transport Lines, Inc. (MTL), an unrelated entity that petitioner had previously utilized for operation and management of its oceangoing transport of chemicals; (3) UMTC concurrently

---

[6] This was described by the parties as a long-term lease of a ship.

entered into a contract (sublease) with petitioner, under which petitioner reserved 75 percent of the vessel's capacity and was responsible for 100 percent of the payments due under the Bareboat Charter; (4) UMTC also entered into an operating agreement with Marine Transport Management, Inc. (a subsidiary of MTL), to manage and operate the vessel; and, (5) UMTC entered into a marketing agreement with another MTL subsidiary to market the portion of the vessel not used by petitioner, including the 25 percent not reserved by petitioner.

The terms of the Bareboat Charter permitted petitioner to terminate the lease and walk away from the arrangement by the payment of a scheduled amount.  Petitioner, however, chose to acquire the vessel.  On December 29, 1993, petitioner purchased, for $107,748,925, Merrill Lynch's interest in the grantor trust that held the vessel, including the title to the vessel and rights to its use.  The $107,748,925 payment was about 20 percent less than the amount that petitioner would have had to pay to terminate the lease without acquiring ownership of the vessel.[7] On June 30, 1994, the Bareboat Charter and related contracts were canceled, the UMTC partnership was dissolved, and petitioner acquired title to the vessel from the trust.  After December 1993, petitioner did not make any (lease) payments under the

---

[7] For purposes of deciding the issue in this summary judgment motion, it should not matter whether it was more or less costly to acquire the vessel or to simply terminate the lease.

Bareboat Charter. Any payment made by petitioner would have resulted in a wash under the various agreements. The UMTC partnership and the sublease arrangements remained in effect, and the marketing and third-party leases continued to operate normally under the agreement until sometime in 1994.

Solely for purposes of his motion, respondent also accepts the fact that the lease was burdensome and that, at the time petitioner acquired it, the value of the vessel was $13,865,000, without considering the value of the lease[8]. Under this scenario, petitioner is seeking to allocate $93,883,295, or 87 percent, of the $107,748,295 purchase price to the termination of the burdensome lease, leaving $13,865,000 attributable to its basis in the vessel.

Petitioner questions respondent's assumption in his motion that the lease remained in existence and was not terminated until June 30, 1994. Petitioner argues that the lease was effectively terminated in December 1993 after the vessel was purchased, and the June 30, 1994, termination was merely a formality. Petitioner contends, however, that respondent's position that section 167(c)(2) applies would fail under either scenario.

---

[8] Respondent's concessions cause sec. 167(c)(2) to be the focal point of this opinion and our consideration.

## Discussion

A.  Summary Judgment.  Summary judgment may be granted if it is demonstrated that no genuine issue exists as to any material fact and that a decision may be entered as a matter of law.  See Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).  The moving party bears the burden of proving that there is no genuine issue of material fact, and factual inferences will be read in a manner most favorable to the party opposing summary judgment.  In that regard and solely for purposes of deciding the issue here, we accept petitioner's interpretation that the lease terminated upon acquisition of the vessel.  The parties' contentions with respect to section 167(c)(2) are delineated in a way that would obviate the need to decide whether any of the leases continued to exist after the acquisition of the vessel.  That is so because petitioner contends that the statute applies to property only if acquired subject to a lease that continues in the future, and respondent contends that the statute would apply here because the property acquired was subject to a lease when acquired. Construing the transactional facts here most favorably to the defending party, we are to decide whether a lessee of an asset who purchases that asset for the purpose of terminating the lease is subject to section 167(c)(2).  Accordingly, we may render judgment on the issue as a matter of law.  See Rule 121(b).  The

pleadings, exhibits, transcript of argument, and affidavits contain the facts and information used for the purpose of ruling on the motion herein.

B. Analysis of Section 167(c)(2). Section 167(c)(2) was enacted as section 13261(b)(2) of the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, 107 Stat. 532. It was part of a larger package of provisions aimed at the treatment of intangibles that was enacted in section 197.[9] Under the regimen of section 197, various intangibles are identified, categorized, and subjected to uniform tax treatment. As part of this larger package of rules, section 167(c)(2) was enacted to specifically exclude leasehold interests, including subleases, from the effect of section 197. Even though leases were removed from the effect of section 197, by enacting section 167(c)(2) Congress intended uniform treatment for all situations where a tangible asset was "acquired subject to a lease". In that regard, section 167(c)(2) is designed to prevent taxpayers from allocating any of the cost of acquiring tangible property to

---

[9] Prior to the enactment of sec. 197, depreciation or amortization of intangibles was governed by sec. 1.167(a)-(3), Income Tax Regs., and was a source of considerable controversy between taxpayers and the Internal Revenue Service. See Staff of Joint Comm. on Taxation, Technical Explanation of the Tax Simplification Act of 1993 (J. Comm. Print 1993), Title V, Treatment of Intangibles, Amortization of goodwill and certain other intangibles (sec. 501 of the bill and new sec. 197 of the Code), at 147.

leases or subleases to which the property is subject. See H. Rept. 103-111, at 769 & n.139 (1993), 1993-3 C.B. at 345.

The statute is concise, to the point, and expressed as follows:

> SEC. 167(c). Basis for Depreciation.--
>     (1) In general.--The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011, for the purpose of determining the gain on the sale or other disposition of such property.
>     (2) special rule for property subject to lease.-- If any property is acquired subject to a lease--
>         (A) no portion of the adjusted basis shall be allocated to the leasehold interest, and
>         (B) the entire adjusted basis shall be taken into account in determining the depreciation deduction (if any) with respect to the property subject to the lease. [Sec. 167(c)(1) and (2).]

The parties do not dispute that if we decide that the vessel acquired by petitioner is "property subject to a lease," as referenced in the statute, then no portion of the acquisition cost can be attributed to any lease in question. Where the parties part company is in their interpretation of the phrase "If any property is acquired subject to a lease". Respondent argues that petitioner acquired the vessel subject to the lease to the UMTC partnership; i.e., the lease under which petitioner was entitled to use the vessel. Petitioner, on the other hand, argues that the statute only applies to property that is subject to a lease when acquired and will continue to be subject to the same lease afterwards. Petitioner argues that its purpose in

acquiring the vessel was to terminate the lease, and therefore, it did not acquire property subject to a lease. We must decide which party's interpretation (or possibly whether both interpretations) was intended. Under respondent's position, petitioner would be entitled to depreciate the acquisition cost (approximately $108 million) over the remaining life of the vessel. Petitioner, however, seeks to deduct 87 percent of the acquisition cost (approximately $94 million) in the year of acquisition of the vessel as the cost of terminating a burdensome lease. The remaining amount (approximately $14 million) was to be attributable to the depreciable basis of the vessel. Ultimately, this controversy concerns the timing of deductions in connection with petitioner's acquisition of the vessel and its attempt to terminate the lease.

There is no question about whether the vessel was subject to a lease at the time it was acquired by petitioner. Petitioner argues, however, that as a matter of proper grammatical syntax the statutory language has been phrased to require that acquired property must remain subject to a lease to come within the allocation requirements of section 167(c)(2). Petitioner suggests that Congress would have used the phrase "If any property subject to a lease is acquired" to achieve the outcome advanced by respondent. Petitioner contends that respondent appears to treat the phrase "subject to a lease" as if it

modified the word "property". Petitioner contends that the placement of the phrase "subject to a lease" shows that it modifies the word "acquired" which, grammatically, should mean that the property remains subject to a lease in the hands of the acquiring party.

Respondent agrees that the phrase "subject to a lease" modifies the term "acquired", but contends that "It does so * * * as part of the past participial phrase 'acquired subject to a lease', which, used in conjunction with the verb 'is', modifies and governs 'property'". Respondent contends that such usage constitutes a past participial phrase and that "acquired subject to a lease" merely denotes the gaining of possession. Respondent also points out that the phrase has been placed in the past tense by the use of the word "acquired" and is without continuing or future tense. Finally, respondent references 1 U.S.C. sec. 1 (1994), which provides that "words used in the present tense include the future as well as the present". From this statement, respondent reasons that, conversely, words stated in the past tense (such as "acquired") do not include the future. Thus, respondent concludes that Congress intended to limit the subject phrase to the point of the acquisition of the asset.

Although we appreciate the parties' arguments concerning grammar, Congress' intent should not be decided solely by reference to finite nuances to be found in the rules of grammar.

That is especially so here, where neither party's grammar argument is obviously more correct than the other's. We do not focus solely on such distinctions to decide the intent of Congress in this case.

Normally, we begin our inquiry by looking to the plain language of the statute to interpret its meaning. See Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). When interpreting the words used in a statute, we give them their ordinary meaning. See Jones v. Liberty Glass Co., 332 U.S. 524, 531 (1947). Considering the phrase "If any property subject to a lease is acquired" we reach the conclusion that either party's interpretation is possible, depending on the intent of Congress. The question we must answer is whether the legislation was directed only to situations where a lease is to continue beyond the time of acquisition of the property subject to that lease or whether it applies to an acquisition of property by a lessee where the lease merges into the lessee's new property ownership interest.

The legislative history provides no direct assistance or decisive indicator to answer our particular inquiry. The conference report contains the following general statement:

> Interests under leases of tangible property.--The term "section 197 intangible" does not include any interest as a lessor or lessee under an existing lease of tangible property (whether real or personal). The cost of acquiring an interest as a lessor under a lease of tangible property where the interest as lessor is

acquired in connection with the acquisition of the tangible property is to be taken into account as part of the cost of the tangible property.  For example, if a taxpayer acquires a shopping center that is leased to tenants operating retail stores, the portion (if any) of the purchase price of the shopping center that is attributable to the favorable attributes of the leases is to be taken into account as a part of the basis of the shopping center and is to be taken into account in determining the depreciation deduction allowed with respect to the shopping center.

The cost of acquiring an interest as a lessee under an existing lease of tangible property is to be taken into account under present law (see section 178 of the Code and Treas. Reg. sec. 1.162-11(a)) rather than under the provisions of the bill.  * * *  [Fn. refs. omitted.[10]]

H. Conf. Rept. 103-213, at 681-682 (1993), 1993-3 C.B. 393, 559-560.

Petitioner focuses on the use of the phrase "under an existing lease" in the first paragraph of the above-quoted commentary.  The use of that terminology could refer either to a lease in existence at the time of the acquisition or to a lease that continues in existence.  Petitioner links the use of that phrase to the legislative commentary and the single example that addresses circumstances where the lease would continue beyond the acquisition date.  Petitioner would have us accept that this

---

[10] Sec. 1.162-11(a), Income Tax Regs., similar to sec. 167(c)(2), requires the purchaser of a leasehold interest to amortize an annual aliquot part of the cost over the remaining term of the lease.  As pertinent to this discussion, sec. 178 addresses lease renewal options as affecting the remaining term of a lease.

factor shows that section 167(c)(2) applies only where the lease is to continue.

Respondent correctly points out that the example and discussion of continuing leases does not "expressly condition the application of section 167(c)(2) on the acquisition of a continuing 'interest of a lessor under a lease of tangible property.'" In the context of the commentary and the example, we agree with respondent that it was not intended to limit the application to a particular type of transaction set forth in the example. Although the example discusses a lease that continues beyond the time of acquisition, it is clear that the example is not intended to be all-inclusive. More particularly, the statutory language could easily apply to leases that terminate upon or immediately after acquisition and/or leases that continue beyond acquisition of the leased asset. Accordingly, the legislative history does not provide definitive guidance or a direct answer to our inquiry of whether section 167(c)(2) applies only to a situation where a lease is to continue in futuro. The commentary and the example do make it absolutely clear, however, that all costs were intended to be allocated to the depreciable tangible property.

Petitioner also points out that one of the purposes for enacting section 167(c)(2) was to deal with a specific controversy between lessor/taxpayers and the Internal Revenue

Service.  Those situations involved the amortization of the premium value of an acquired lease on facts similar to the example in the legislative history, supra.  We agree with petitioner that one of the motivating factors for enacting section 167(c)(2) was to deal with that problem.  The statutory language, however, would ostensibly apply to anyone acquiring property and is not in any manner limited to acquisitions for a premium and/or by a purchaser of an asset subject to a lease that is to continue into the future.

The parties have gone to great lengths to reword and/or hypothesize the meaning of statutory phrase in controversy.  The phrase we consider, however, is quite succinct--"If any property is acquired subject to a lease".  The threshold for application of section 167(c)(2) applies to "any property" that "is acquired" when it is "subject to a lease".  If property was not subject to a lease when it was acquired, section 167(c)(2) would not apply.  So we must decide whether the property here was subject to a lease when it was acquired.  The plain language of the statute is not limited in its application to acquisitions by lessors.  Nor does it delineate a requirement that the lease must continue after the acquisition, only that the property be acquired subject to a lease.

In order to interpret the phrase "subject to a lease" solely as a continuing requirement as suggested by petitioner, we would

have to look outside the statutory language. It appears that section 167(c)(2) would be triggered irrespective of whether the lease had a remaining term of 1 day or 10 years. With that premise, it is difficult to accept petitioner's argument that its own circumstances should be exempted from the statutory requirements. If we accept petitioner's interpretation that the lease must continue, a taxpayer would be able to avoid the intended effect of section 167(c)(2) merely by a simultaneous acquisition of tangible property, cancellation of the "existing lease", and the renegotiation of a new lease. Under petitioner's interpretation, section 167(c)(2) would be rendered impotent and meaningless. Whether we accept the fact that petitioner's lease terminated upon, 6 months after, or sometime more distant from the acquisition of the vessel, the lease did not terminate until petitioner acquired the vessel. Accordingly, petitioner acquired the vessel at a time when it was subject to the lease.[11]

---

[11] Respondent points out that in Kloppenberg & Co. v. Commissioner, T.C. Memo. 1986-325, where the taxpayer was similarly attempting to value a capital asset without considering the value of the lease, this Court used the phrase "subject to [a] lease" in the same manner in which respondent advocates that it be used here. In disagreeing with the taxpayer's approach in Kloppenberg, we stated:

No one disputes that after May 3, 1978, * * * [the taxpayer] owned the * * * property in fee simple. However, * * * [the taxpayer's] argument that the lease should therefore be disregarded ignores the fact that * * * [the taxpayer] owned a significant interest in the * * * property prior to the challenged transaction. It is not the value of the combined interest which

(continued...)

C.  Petitioner's Alternative Position.  Although we have decided that petitioner's acquisition of the vessel is governed by section 167(c)(2), the same result would have been reached even if section 167(c)(2) had not been enacted.  Petitioner argues that we should treat the acquisition as though it were two separate payments or portions.  Petitioner contends that one portion would be attributable to the acquisition of a vessel worth substantially less than the $108 million total payment and the other should be attributable to the cancellation of a burdensome lease.  Respondent points out that petitioner chose the approach to acquire the vessel instead of making the payment to terminate the burdensome lease.  We note that petitioner's cost to acquire the vessel was approximately 20 percent less than the cost of the option permitting termination of the lease. Petitioner, therefore, wishes us to treat the acquisition of the vessel as though it had, in effect, exercised both choices-- petitioner wishes "to have its cake and eat it too!"[12]

_____

[11](...continued)
 * * * [the taxpayer] owned after May 3, 1978, which is
in issue.  Rather, it is the interest which * * * [the
taxpayer] purchased from * * * [the owner/lessor] on
that date, i.e., a fee simple interest subject to the
outstanding lease.  * * * [Id.; with emphasis as
suggested by respondent.]

[12] Petitioner obviously followed the less costly approach
from a financial perspective, but not necessarily from a tax
perspective.  Petitioner has provided no explanation for the 20
percent larger cost to terminate the lease than to acquire the
(continued...)

The main thrust of petitioner's argument is that it was effectively doing two different things, even though it had solely exercised the option of acquiring the vessel for the contract price. On brief, petitioner went to great lengths to convince us that section 167 deals solely with depreciation or amortization and that section 162 (concerning ordinary and necessary business deductions) governs the portion of its transaction that effected the termination of the lease. Respondent does not question petitioner's premise that section 162 deals with the pure situation where there is an expenditure to cancel or terminate a burdensome contract or lease. The approach that petitioner uses to make its point is to argue that the value of the vessel without considering the lease is $14 million, and so the remaining $94 million of the $108 million acquisition price was paid to cancel a lease[13]. Petitioner's approach has met with

---

[12](...continued)
vessel. The difference was built into the contract terms so that it was not due to some change in conditions, such as extraordinary wear of the vessel (leased asset).

[13] We note that the parties, for purposes of this summary judgment motion, agree that the vessel's value, without considering the value of the subject lease, was $14 million. Petitioner would attribute the difference between the $108 million acquisition cost and the $14 million to cancellation of the lease. Respondent, on the other hand would attribute the difference to value of the use of the acquired vessel for the remainder of its useful life. Respondent's approach is in line with the approach, if not the intent, of sec. 167(c)(2) and existing case law. As discussed infra, the fair market value of the vessel when petitioner acquired it was more than $14 million
(continued...)

success in only one circuit and has not met with success in this

Court, the Court of Appeals for the Second Circuit, and the

Supreme Court.[14]

Petitioner attempts to bolster its argument by referencing

several cases where transactions were split or bifurcated to

permit differing results with respect to each portion of the

transaction. With one exception,[15] the courts have not permitted

a current deduction to terminate a burdensome lease where the

lessee purchased the leased asset. There are cases permitting a

current deduction for the cost of terminating a burdensome lease

or contract obligation, but those cases do not involve the

---

[13](...continued)
because of the value of the stream of income attributable to the
lease. In the factual setting of this case, the fair market
value of the vessel (as opposed to the value without considering
the existing lease) included the stream of rental income.
Accordingly a willing seller would not have ignored the value
attributable to the use of the vessel, especially where the
lessee was obligated to pay for that use, irrespective of whether
the lessee used the vessel. When petitioner acquired the vessel,
it acquired the physical asset and the right to its use.
Petitioner in attempting to attribute the majority of the
acquisition cost to an expense for canceling the lease, ignores
its ability to use or lease the vessel. Accordingly, it is
difficult to reconcile petitioner's approach to value.

[14] To some extent the case law that predated the enactment
of sec. 167(c)(2) is instructive in interpreting the statute.
The very approach suggested by petitioner has been thoroughly
considered by this and other courts.

[15] The exception is to be found in Cleveland Allerton Hotel,
Inc. v. Commissioner, 166 F.2d 805 (6th Cir. 1948), revg. a
Memorandum Opinion of this Court dated May 7, 1947, which is
discussed in detail later in this opinion.

acquisition of a capital asset. When section 167(c)(2) was enacted, with the exception of some precedent in the Sixth Circuit, the courts did not permit the approach sought by petitioner here--allocating part of the cost of acquiring a leased asset to a deductible expense (attributable to the termination of a burdensome lease).

Generally, the courts have held[16] that in the acquisition of a leased asset, the portion of the cost attributable to an existing lease is to be associated with or attributable to the value of the asset. The value of the asset without considering the lease has not been considered the true measure of the asset's value. To value the asset without considering the lease would be to ignore a stream of income (rent) to which the owner of the asset is entitled. A seller of an asset would not separate the lease from the leased asset and ignore what may be the asset's principal source of value. At some point in the life of a leased asset, the income (rent) to be derived may exceed the residual value of the asset. That is why the vessel here (about halfway through the term of a 20-year lease) may have a value (without considering the lease) of about $14 million, whereas the income

---

[16] The opinions in which this question was considered date back more than 40 years and preceded the enactment of sec. 167(c)(2) by more than 30 years.

stream from the remaining life of the lease may have been valued at about $94 million.[17]

Respondent contends that case precedent in existence prior to the enactment of section 167(c)(2) is consistent with the restriction contained in section 167(c)(2); i.e., that the buyer may not allocate to the lease any portion of the acquisition cost of the leased property. As explained above, petitioner contends that its transaction is a two-part transaction and should be bifurcated into the cost of acquiring a capital asset and the cost of canceling or terminating a burdensome lease. Although the acquisition of the vessel may have effectively terminated the lease, the transaction which caused the lease termination was capital in nature. Accordingly, a significant prerequisite to petitioner's success is its ability to bifurcate the cost expended to acquire the capital asset and allocate the cost into two portions--one attributable to the capital asset and the other to the cost of terminating the burdensome lease.

Petitioner argues that the value of the vessel at the time of the acquisition was substantially less than it was required to

---

[17] The acquisition of a leased asset by the lessee is somewhat unique when compared to the acquisition of the asset by a third party. That is so because at the time of acquisition of a leased asset by the lessee, the leasehold interest merges into the fee ownership whereas a third-party purchaser of a leased asset does not experience a merger of interests. Petitioner's approach would result in highly beneficial treatment to lessees that would not otherwise be available under sec. 167(c)(2) to lessors and others who might acquire leased assets.

pay and the difference is attributable to the lease cancellation.
Petitioner's characterization is no different from the arguments
that have been made in several cases considered by this and other
courts prior to the enactment of section 167(c)(2).  Except for
the holding in one circuit, courts have not permitted a lessee's
allocation of a portion of the acquisition cost of a leased
capital asset to the cancellation of a burdensome lease in order
to permit a business deduction under section 162.  The Supreme
Court, the Court of Appeals for the Second Circuit, and this
Court have all reasoned that the value attributable to the
lease's income stream represents value that a third-party buyer
would be required to pay the seller for the leased asset.  As
pointed out above, no seller would part with a leased asset
without receiving value for the income attributable to the lease.
Using that rationale, the Supreme Court approved the Court of
Appeals for the Second Circuit's approach of allowing the
acquisition cost (including the portion attributable to the value
of the lease) to be made part of the acquired asset's depreciable
basis.

Petitioner's argument was addressed about 40 years ago in
two seminal cases:  <u>Cleveland Allerton Hotel, Inc. v.
Commissioner</u>, 166 F.2d 805 (6th Cir. 1948), revg. a Memorandum
Opinion of this Court dated May 7, 1947, and <u>Millinery Ctr. Bldg.</u>

Corp. v. Commissioner, 21 T.C. 817 (1954), affd. in part, revd. in part 221 F.2d 322 (2d Cir. 1955), affd. 350 U.S. 456 (1956).

Cleveland Allerton Hotel, Inc. involved a hotel that was built on land subject to a 100-year lease with a $25,000 annual rental. About 20 years into the lease the hotel owner acquired the underlying land for $441,250. At the time of the acquisition, the unimproved and/or unencumbered value of the land was $200,000, and the adjusted basis for the building was $267,150. The taxpayer/building owner added to the adjusted basis of the building, for depreciation purposes, the excess paid over the $200,000 value of the land. The question considered by this Court was whether respondent erred in disallowing depreciation by the taxpayer in excess of the preacquisition adjusted basis ($267,150).

This Court decided that the taxpayer's purchase of the land for $441,250 was the value any purchaser would have paid for land that had the benefit of an income-producing lease. Accordingly, it was concluded that the entire acquisition cost represented a nondepreciable capital expenditure attributable to the cost of the land. On appeal, the Court of Appeals for the Sixth Circuit reversed, concluding that the taxpayer was entitled to currently deduct, as a business expense, the excess of $441,250 over the $200,000 value of the unencumbered land as a cost of extinguishing the lease.

In Millinery Ctr. Bldg. Corp. v. Commissioner, supra, the facts were essentially the same as in Cleveland Allerton Hotel, Inc. v. Commissioner, supra, and the taxpayer, relying on the Court of Appeals' holding in Cleveland Allerton Hotel, Inc., sought to deduct the excess of the acquisition cost of the underlying leased land over the unimproved value of the land. This Court, choosing not to follow the holding of the Court of Appeals for the Sixth Circuit, held that the excess was not currently deductible as an ordinary and necessary business expense. In addition, this Court held that the taxpayer was not entitled to add the excess of the amount paid over the unimproved value of the land to the depreciable basis of the building.

On appeal, the Court of Appeals for the Second Circuit affirmed this Court's holding that the excess was not currently deductible as a business expense. The Court of Appeals, however, reversed our holding that the taxpayer was not entitled to allocate a portion of the acquisition cost to the depreciable basis of the building. Accordingly, the Court of Appeals agreed with this Court and disagreed with the Court of Appeals for the Sixth Circuit with respect to whether any portion of the cost allocable to the lease was currently deductible. Because of this conflict between the Courts of Appeals, the Supreme Court granted the taxpayer's certiorari petition.

The Supreme Court affirmed the holding of the Court of Appeals for the Second Circuit; i.e., that the taxpayer was entitled to an allocation of the acquisition cost between the building and land and entitled to depreciate the basis over the remaining useful life of the building.[18]  The Supreme Court noted that, as lessee of the land, the taxpayer's "ownership" or use of its building was subject to significant control by the lessor and to conditions of the lease.  For example, the taxpayer's right to use its building was burdened by the payment of rent and the obligation to relinquish use of the building and/or to demolish the building at the end of the lease term.  This point suggests that in purchasing the land, the taxpayer may, to some extent, have been perfecting unfettered ownership in the building.

In addition, the Supreme Court pointed out that the Millinery Ctr. Bldg. Corp. v. Commissioner, supra, taxpayer did not prove that its rental payments were excessive for what it was leasing, and, therefore, the Supreme Court left for another day the question of the deductibility of payments for relief from the terms of a lease.  In deciding that the approach of the Court of

_____

[18] The allocation permitted was between a depreciable (building) and a nondepreciable (land) portion of the merged interest.  The Government did not seek Supreme Court review of the depreciation allowance of that portion of the acquisition cost that exceeded the value of the building's remaining economic life.  No portion was permitted to be deducted as current business expense attributable to the effective cancellation of the land lease.

Appeals for the Second Circuit was correct, however, it would appear that the approach of the Court of Appeals for the Sixth Circuit was rejected. Accordingly, the vitality of the holding in Cleveland Allerton Hotel, Inc. v. Commissioner, supra, holding is questionable.[19] In spite of these circumstances, petitioner strongly urges that it is entitled to rely on the Cleveland Allerton Hotel, Inc. holding.[20] Further complicating petitioner's situation, any appeal of our decision here would be to the Court of Appeals for the Second Circuit--the "Millinery Ctr. circuit". That, of course, militates against petitioner's chances for success on appeal, because petitioner would have to

---

[19] Petitioner has provided only one case with comparable facts and squarely on point that followed Cleveland Allerton Hotel, Inc. v. Commissioner, supra. See Troc, Inc. v. United States, 126 F. Supp. 786 (N.D. Ohio 1954). In that regard, we note that the Troc, Inc. case preceded the Supreme Court's opinion in Millinery Ctr. Bldg. Corp. v. Commissioner, 350 U.S. 456 (1956) and that it was within the Sixth Circuit Court of Appeals' venue.

[20] Petitioner also relies on Priv. Ltr. Rul. 98-42-006 (June 22, 1998) and Field Service Advice 199918022 (May 7, 1999), both of which were issued subsequent to the transaction in question and, accordingly, could not have been relied upon. The administrative discussions give petitioner some solace in their discussions of Cleveland Allerton and the absence of any discussion of or reliance on sec. 167(c)(2). Irrespective of the positions or discussions contained in those administrative documents, they are statutorily of no precedential value. See sec. 6110(k)(3). Respondent argues that the cited ruling and advice are distinguishable. Accordingly, whether the discussion or positions in rulings or internal advice memoranda are favorable or unfavorable to taxpayers, in the present situation we give them no weight.

sway the thinking of the appellate court that expressly disagreed with the Cleveland Allerton Hotel, Inc. holding.[21]

Accordingly, at the time of the enactment of section 167(c)(2), the weight of case authority did not permit the relief sought by petitioner. More significantly, in affirming the Second Circuit Court of Appeals, the Supreme Court's holding in Millinery Ctr. Bldg. Corp. v. Commissioner, supra, resulted in the same outcome as the one prescribed by section 167(c)(2); i.e., no allocation of the acquisition cost to the lease was permitted in circumstances where a leased asset is acquired. Further, both the case precedent and the statute require that all of the cost be allocated to the depreciable capital asset.[22]

---

[21] Respondent attempts to resolve these entangled circumstances by reference to our holding in Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). There we expressed the view that we would conform to the holding of a Federal Court of Appeals that is squarely on point, irrespective of whether we agree with that Court of Appeals' holding. We have specifically disagreed with the holding of the Court of Appeals for the Sixth Circuit's Cleveland Allerton holding. See Millinery Ctr. Bldg. Corp. v. Commissioner, 21 T.C. 817, 823-824 (1954), affd. in part, revd. in part 221 F.2d 322 (2d Cir. 1955), affd. 350 U.S. 456 (1956). The appeal of this case, as noted above, will be to the Court of Appeals for the Second Circuit, which agreed with our holding and disagreed with the Court of Appeals for the Sixth Circuit. See Millinery Ctr. Bldg. Corp. v. Commissioner, 221 F.2d at 323.

[22] Where land with improvements was acquired, the courts have permitted the excess of the purchase price over the value of the land to be allocated to the building, a depreciable asset. In the present case, no such nondepreciable asset (such as land) is involved, and under sec. 167(c)(2) all of the acquisition cost is to be allocated to the acquired leased property.

Therefore, the existing case law and statutory provision are generally in harmony. It may also be fair to say that Congress was aware of the Supreme Court's holding in <u>Millinery Ctr. Bldg. Corp. v. Commissioner</u>, <u>supra</u>, when it enacted section 167(c)(2) for leases as part of a larger statutory package intended to result in uniform treatment for intangibles.

We note that allocation of the acquisition cost of a leased asset under section 167(c)(2) operates irrespective of whether it would have been more or less beneficial to the taxpayer to allocate otherwise. In petitioner's situation, it obviously would be more beneficial if 87 percent of the acquisition payment for the vessel was currently deductible as a business expense incurred to terminate a burdensome lease. We can think of no reason why petitioner, as a lessee, should be treated any differently from a nonlessee/taxpayer who acquires a leased asset. In that regard, petitioner has not provided any persuasive evidence showing that Congress intended to exclude the acquisition of a leased capital asset by the lessee. Nor has it shown that Congress intended that the lessees should be allowed to allocate a portion of the acquisition cost of an asset to a lease and that lessors should not be so entitled.

In summary, petitioner has not shown that there is any reason to read section 167(c)(2) to exclude transactions where a lessee purchases the leased asset or to read the statute as

applicable only to existing leases that are to continue in futuro. In addition, the existing case precedent is in harmony with section 167(c)(2) by not permitting allocation of a portion of the purchase price of a leased asset to the value or cost of the lease.

Accordingly, we hold that section 167(c)(2) applies to petitioner's acquisition of the vessel, and respondent's Motion for Partial Summary Judgment will be granted.

<u>An appropriate order will be issued.</u>